**STATE of Minnesota, Respondent,**

v.

**Kirk Allen CARLSON, Appellant.**

**No. 46589.**

Supreme Court of Minnesota.

May 12, 1978.

C. Paul Jones, Public Defender, J. Christopher Cuneo, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Keith M. Brownell, County Atty., Michael W. McNabb, Asst. County Atty., Duluth, for respondent.

PER CURIAM.

Defendant was found guilty by a district court jury of the gross misdemeanor charge of obstructing an arrest, Minn. St. 609.50,[1] and was sentenced by the trial court to a 1-year jail term. Because of the combined prejudicial effect of the erroneous admission of certain evidence by the trial court and the inadequate and possibly misleading instructions by the trial court, we reverse and remand for a new trial.

On Sunday evening, October 19, 1975, Officers Gary Waller and Richard Miller of the Duluth Police Department worked as plainclothes security officers at a rock concert held at the Duluth Arena Auditorium. During the course of the evening they observed three young men in the balcony passing a marijuana cigarette among themselves. The officers approached the young men, showed them their police identification, and arrested them. One of the arrestees, Wesley Stenstrop, apparently was able to say a few words to his girl friend, Cynthia Rood. Both Stenstrop and Rood testified at trial that Stenstrop told her to go tell defendant about the arrest.

After searching the three, one of whom was a juvenile, the officers handcuffed them and began to walk them to the detention room in the arena, where a decision would be made whether to simply cite the three or take them into custody. The juvenile and the other adult were handcuffed together and were told to walk in front of Officer Miller. Stenstrop's hands were handcuffed behind his back and he was told to walk behind Miller and in front of Waller. Thus, as the five walked toward the detention room they formed a kind of "T".

After they came down the stairs from the balcony hallway, they went past a concession stand and down a hallway toward the detention room. It was intermission time and there were people in the stairs as they came down and people at the concession stand, but there was no one else in the hallway leading to the detention room because that is a hallway which concertgoers would use only when leaving the concert. As the five came down the stairs Rood ran up to defendant, who was in the concession area with another person named Mike Himango, and told defendant something. Defendant testified that she said: "[T]hey've got Wesley." Rood testified that she had planned to say "Kirk, Wes is getting busted," but that all she really said was "Kirk" and then pointed at the five.

As the five passed the concession stand Wesley Stenstrop, seeing defendant, stopped walking and shouted "Kirk" a couple times. Officer Waller testified that when Stenstrop stopped and shouted, he gave Stenstrop a push to let him know he should keep walking, and they all continued walking in T-formation down the empty hallway toward the detention room. At the time, Miller had a hand on the cuffs which connected the two in front of him, and Waller was walking about 2 feet behind Stenstrop. Stenstrop's hands were cuffed behind him, and the record indicates that the cuffs were not covered by any clothing.

Both Miller and Waller testified that they heard the sound of someone running. Waller did not turn but Miller did, and he saw defendant hit Waller in the back-shoulder-neck area. Miller himself was then confronted by Himango. Waller testified that he immediately turned and told defendant that he and Miller were police officers and began to wrestle defendant. He testified that defendant continued to resist even after being told a second time. Meanwhile, Miller had drawn his service revolver, identified himself as a police officer, and ordered Himango up against the wall. Miller

1. Minn. St. 609.50 reads as follows: "Whoever intentionally obstructs, hinders or prevents the lawful execution of any legal process, civil or criminal, or apprehension of another on a charge or conviction of a criminal offense or interferes with a peace officer while the officer is engaged in the performance of his official duties may be sentenced as follows:

"(1) If the act was accompanied by force or violence or the threat thereof, to imprisonment for not more than one year or to payment of a fine of not more than $1,000, or both; or

"(2) In other cases to imprisonment for not more than 90 days or to payment of a fine of not more than $300, or both."

then went to Waller's assistance, pointing the gun at defendant. Defendant, who according to Waller had been told twice that Miller and Waller were police, responded by grabbing the gun and attempting to wrestle it from Miller. Himango then rejoined the fight and Miller again had to subdue him, while Waller subdued defendant.

Defendant, who was 25 years old at the time, testified that he was a friend of Stenstrop and had seen him at the concert but that he had been sitting with Himango, not with Stenstrop. He denied that Cindy Rood told him the police had arrested Stenstrop. He testified that as she started to talk he heard Stenstrop shout at him and he turned and saw Waller push Stenstrop. He testified that he concluded that Stenstrop was in a fight and that some people were taking him outside to beat him and he immediately decided to assist him. He insisted that Waller did not tell him at any time that he was a police officer. He also testified that he had no idea that Mike Himango was with him as he ran down the hall and intervened.

Stenstrop, testifying for defendant, admitted on direct examination that he had pleaded guilty to possession of marijuana as a result of the incident.[2] He testified that the only reason he wanted defendant to know he was under arrest was that he wanted defendant to bail him out, not to interfere with the arrest. Asked if he had an opportunity to hear the officers say anything, Stenstrop replied, "No, I couldn't hear nothing."

1. One of the two main issues in this case is whether the trial court prejudicially erred in permitting the prosecutor to elicit testimony relating to the clothing defendant and Stenstrop were wearing on the evening in question—specifically, testimony that they were both wearing denim jackets with sleeves ripped off and with motorcycle club insignia on the back.

Defense counsel initially raised the matter in chambers before the prosecutor made his opening statement. He asked the court for a ruling barring the state from eliciting testimony relating to any motorcycle-type insignia or any reference to defendant being a member of a motorcycle gang. In support of this request, defense counsel argued that the evidence was irrelevant and that it would prejudice the jury because of the popular belief that members of motorcycle gangs are bad people.

The prosecutor, admitting it was possible the testimony concerning the clothing might prejudice defendant in some way, stated:

"The two individuals that attacked the two officers—it's important that the Jury be told that they—and if it is because they were wearing similar insignia of some motorcycle group, not a gang, it's important the Jury knows that. If he comes in here with a suit on, it's important to know when he was at the rock concert, his hair was down to his waist."

The court then denied the motion, saying that the motion was premature and that he would rule on the evidence when it was offered.

The prosecutor first elicited testimony of this nature from Officer Waller as follows:

"Q. Thank you, Officer. Specifically, if you can recall, Officer Waller, as you were proceeding towards the concession stand, down from upstairs, what were the individuals wearing? How were they attired?

"A. Mr. Stenstrop, the man that I had searched and handcuffed, was wearing denim pants. He was wearing a dark colored leather jacket. I don't remember if it was dark brown or black. And over that leather jacket, he had a denim jacket that had the sleeves cut off. I don't recall that he had any headwear on. I don't recall what he had on his feet.

"Q. Were there any other identifying marks on his clothing?

2. The jury also learned that the other adult arrested for marijuana possession also pleaded guilty.

"MR. BIETER: Objection, Your Honor. It's the matter I objected to earlier. You reserved your ruling on it. I object again, prejudicial, no probative value.

"THE COURT: Overruled, he may answer.

"THE WITNESS: I recall that there were some markings on the back of that denim vest-like jacket, that are indicative of a motorcycle gang.

"MR. BIETER: I move for a mistrial.

"THE COURT: Do you want to make a record? Do you want to argue it?

"MR. BIETER: Yes, Your Honor.

"THE COURT: Jury can retire to the Jury room.

"(Whereupon, the Jury retired to the Jury room)."

At this point, counsel again argued the matter to the court. Defense counsel repeated what he had said earlier. The prosecutor clarified his position somewhat, saying:

"In response to the question at hand in the mistrial, because of the prejudicial information. I do believe that it is necessary in this trial, although it is a close trial, I think it is the information that ties these individuals together and the reasoning behind what happened here, that they're of the same motorcycle gang.

"I think it is relevant and I think it can be brought out at every point in this trial, that these individuals are together, they are in the same group. It doesn't matter what type of group it is. If they had had Boy Scout uniforms on, I would have brought that out, that they were friends and this is their common bond."

The court then asked defense counsel if the defense had stipulated that defendant and Stenstrop were friends, and defense counsel replied that that was not an issue and that the state did not need to prove this. The court then denied the motion for a mistrial, saying that the evidence was descriptive of the individuals at the time of the arrest and would tie the individuals together. The court, however, agreed to give an immediate cautionary instruction to the jury. Specifically, the court told the jury the following:

" * * * [Y]ou have heard testimony from this witness that Mr. Stenstrop's clothing contained a motorcycle gang insignia on the back. I instruct you that if you have any negative or unfavorable impressions of motorcycle gangs, or motorcycle clubs, you should not use this negative or unfavorable impression as evidence against the Defendant. It was presented to you for identification purposes. Proceed."

The first reference to the clothing of defendant himself came during Officer Miller's testimony:

"Q. While you were in that area did you have an opportunity to observe what Mr. Carlson, the defendant, was wearing?

"A. I believe he had on Levi's, black leather jacket with sleeveless Levi jacket on top of the leather jacket.

"Q. Did he have any other insignia?

"A. He had an insignia on the back of his Levi jacket.

"Q. Was this the same insignia that was on Mr. Stenstrop's jacket?

"A. I don't recall if it was or not."

The state rested after Miller completed his testimony and defendant then took the stand and testified in his own behalf, stating on direct examination that he had been in a motorcycle accident in the summer of 1975 and that he belonged to a motorcycle club because he liked to ride motorcycles. On cross-examination he stated that there was a motorcycle club insignia on the back of his denim jacket but it was not the same as Stenstrop had on his jacket. He also testified that neither Stenstrop nor Himango rode motorcycles.

In his closing argument the prosecutor went down the list of all the witnesses for the state and defense and basically argued that each one had some sort of interest in the case. Included in this argument was the following reference to the testimony about the dress of Stenstrop and defendant:

"Further, Miss Rood's testimony also shows, I believe, an interest in the case from the standpoint that she personally

knows the defendant. At the time of this incident was dating Mr. Stenstrop. I realize that they're not going together now, but I think there was still enough knowledge there that she definitely does have an interest in the case. This is the important aspect that we have to remember.

"Also, you have to look at what I believe to be similarity of the two men, the attire of the two, the defendant and Mr. Stenstrop. The way they were dressed that evening. The group that they hung around, together. The similarity of that group. I believe that those three individuals are very, very interested parties to this lawsuit and so any time you've got interested parties you have to take a hard look at whether they're putting their interests above the truth. That's important."

Late in his closing statement the prosecutor arguably alluded to this evidence again when he made the following statement:

"What did he think when Cindy Rood told him they've got Wesley? Did he look down? Did he see somebody that looked like hoods down there? They've got Wesley. If that's what she said, the question is, who would they be besides police officers? He was able to look down there. He would see two individuals who were dressed, what the testimony is, too nice for individuals who would be at a rock concert. They're not going to be hassled by anyone at that point, except for the police. Now, a guy has to be reasonable in what he believes and what he thinks is going on."

Defense counsel in his closing statement tried to neutralize the effect of his evidence, stating as follows:

"Finally, there's been evidence introduced in the case that Mr. Carlson was dressed as a member of the B.P.M.'s, a motorcycle club, which is also known as the Brotherhood of Proud Motorcyclists. You will recall after this evidence was introduced to you, over my objection, that the Court then instructed you that you were not to consider this evidence or consider any opinion you may have about

people that ride motorcycles. You are not to use your opinions as evidence of guilt of this charge. And I suggest that you will follow the Court's instructions on that.

"I would suggest to you that the reason this evidence was put in before you was because the County Attorney's office would hope that the Jury would just use that, maybe unconsciously as guilt by association."

Defendant in his brief repeats his argument made at trial about the irrelevance and potential for prejudice of the evidence. The state in its brief makes the following argument in support of the evidence:

"In this case the clothing was a significant item that tended to show the close relationship between friends (the defendant and Stenstrop) who had known each other for three years, who had gone to concerts together before, and who had planned to meet at the rock concert at which they were arrested. * * * The similar nature of the clothing would be significant even if it were the uniform of a social service organization, as the prosecutor pointed out to the trial judge. * * * The closeness of the relationship between the defendant and Stenstrop had a direct relation to the strength of the inferences that the jury could draw from that relationship. The better that the defendant knew Stenstrop, the more reasonable it is to infer that the defendant knew that Stenstrop smoked marijuana and was therefore liable to be arrested at a public concert for possession of marijuana (which is exactly what happened). This inference, along with the other facts, then makes it reasonable to conclude that the defendant knew that Stenstrop had been placed under arrest by a plain clothes police officer when he saw Stenstrop in handcuffs being taken out of the hall and that he intended to prevent the officer from taking his friend into custody.

"In today's society, as well as in the past, people have used clothing to express their relationships. Testimony about the

clothing worn by the defendant and Stenstrop at the time of the crime was relevant evidence and was properly admitted."

The general test in determining whether evidence is relevant is to ask whether in some degree it advances the inquiry and thus has probative value. Rule 401, Rules of Evidence; McCormick, Evidence (2 ed.) § 185. Relevant evidence is inadmissible, however, if the tendency of the evidence to arouse the jury's emotions of unfair prejudice, hostility, or sympathy substantially outweighs the probative value of the evidence. Rule 403. In this case the evidence arguably was relevant; however, we believe the potential of the evidence to cause the jury to deal with the issue of guilt on an emotional level substantially outweighed the arguable probative value of the evidence, and therefore we hold that the trial court abused its discretion in admitting the evidence. We need not decide whether the admission of the evidence by itself would necessitate a retrial because there was other serious error which, when combined with this error, forces us to grant defendant a new trial.

2. The other key issue to which we refer is the adequacy and propriety of the trial court's instructions on the elements of the offense. Following is the complete instruction which the court gave on the elements of the offense:

"Now, in this case Kirk Allen Carlson is charged by a complaint with the crime of obstruction of legal process or arrest. The case was commenced by the filing of the complaint in which the County Attorney alleges that on the 19th day of October, 1975 in the City of Duluth and County of St. Louis, the State of Minnesota, the defendant, Kirk Allen Carlson and Michael W. Himango did wrongfully, willfully, each aiding and abetting, counselling with one another, prevent the lawful execution of any legal process, civil or criminal or the apprehension of another on a charge or conviction of a criminal offense or interfere with a police officer while the officer was engaged in the performance of his official duty, facilitating force and violence in said obstruction. Said obstruction causing the gross misdemeanor.

"I now inform you that Mr. Himango was charged and will, at a later date, be tried for the same offense.

"The elements of obstructing legal process are as follows: The law is that one who intentionally obstructs, hinders or prevents the apprehension of another on a charge or conviction of a criminal offense or interferes with a peace officer while the officer is engaged in the performance of his official duties is guilty of obstructing legal process or arrest if the act was accomplished by force or violence or the threat thereof. This charge being a gross misdemeanor.

"You will also be given a verdict for misdemeanor for assault, which reads as follows: Whoever does any of the following commits an assault and is guilty of a misdemeanor. One, does an act with intent to cause fear in another of immediate bodily harm or death or intentionally inflicts bodily harm upon another.

"Reasonable—. It is the law in the State of Minnesota that reasonable use of force maybe used upon or for the person of another without his consent when the following circumstances exist or the actor reasonably believes them to exist. When used by a police officer or one assisting him under his direction. A., in affecting the lawful arrest or B., in the execution of legal process or C., in executing any other duties imposed by him by law.

"Minnesota Statutes 609.06 relate to the authorized use of force. Reasonable force maybe used upon or for the person of another without his consent when the following circumstances exist or the actor reasonably believes them to exist. Three, when used by any person in resisting or aiding another to resist an offense against his person.

"You are instructed that Minnesota Statutes 609.02, Subdivision 9, Sub., 3, defines intentionally to mean that the actor either has a purpose to do the thing

or cause the result specified or believes that his act, if successful, will cause that result. The actor must have knowledge of the facts which are necessary to make the crime criminal, which are set forth after the word, intentional.

"You are instructed that it is the law in the State of Minnesota to prove every element of the crime charged by proof beyond a reasonable doubt. Regarding the charge of obstruction of legal process or arrest, the charge brought against the defendant, Kirk Allen Carlson, the State must prove the following elements beyond a reasonable doubt. Either that the defendant intentionally obstructed, hindered or prevented the apprehension of another on the charge or conviction of a criminal offense or that the defendant intentionally interfered with a peace officer while the officer was engaged in the performance of his official duty. Or if such acts were accompanied by force or violence or threats, thereof.

"I further instruct you that as a matter of law the Court has found that while the two police officers made legal arrests at the Arena and transported their prisoners to the detention room, they were performing their official duties as police officers."

Defendant argues first that the trial court did not adequately instruct the jury on defendant's theory of the case and that it should have given the following requested instruction which clearly set forth defendant's theory:

"It is defendant's position that he did not intentionally commit the crime charged, but rather that he used reasonable force to resist an offense against the person of Wesley Stenstrop.

"I instruct you that it is a defense to the crime charged if you find that the defendant acted, although mistakenly, under a reasonable and actual belief that the state witnesses were committing an offense against the person of Wesley Stenstrop and that he used reasonable force."

Defendant's second argument is that the trial court erred in instructing the jury that as a matter of law the court had found that the police made legal arrests and were performing their official duties in transporting the three to the detention room. Defense counsel objected to this at trial.

The state's response to these two contentions is that the court properly instructed the jury on defendant's theory of the case since he read the statute dealing with reasonable use of force and that the court properly may instruct the jury that an uncontradicted fact exists even though that fact constitutes an essential element of the offense.

■■■ We deal first with the issue relating to the trial court's instructing the jury that the officers had made legal arrests. The general rule is that a jury has a power of lenity and can bring in a not guilty verdict in the teeth of the facts. While it does not follow from this principle that a defendant is entitled to have all lesser-included offenses submitted even if the evidence does not reasonably warrant their submission, it does follow that he is entitled to have all the elements of the offense with which he is charged submitted even if the evidence relating to these elements is uncontradicted. It is also the rule, however, that if the defendant admits certain elements, then the court can so instruct the jury. Thus, in *State v. Morrison*, 298 Minn. 179, 213 N.W.2d 629 (1974), this court stated that it was proper in a first-degree murder case for the trial court to say that the defendant had admitted killing the victim because in fact defendant had admitted that.

■■■ In the instant case the defense counsel wanted to have it both ways apparently. He protested when the trial court indicated that it was going to instruct the jury that the arrests were lawful, but then in his closing argument defense counsel admitted the arrests were lawful, stating as follows:

"* * * I don't want you to think that it has ever been our contention that Gary Waller or Rick Miller did anything

improper at all in connection with this case. I have never charged police brutality. It just does not apply in this case.

"Their actions under the circumstances were totally proper and within the law. I've been practicing for about six years up here, both as a former Assistant County Attorney and as a private defense attorney. In the past I've had many cases, both where I've worked with Gary and Rick and of course, cases where I'm on the other side.

"As citizens of Duluth, you should know that we have one of the finest police departments in the State. In my six years I never have come across a case where I thought there really was any police brutality. So that doesn't apply here."

We do not see how a defendant who admits to the jury that the police acted properly can later successfully argue that the trial court erred in instructing the jury that the arrests were lawful. As a general rule, however, we believe courts should be extremely reluctant to remove issues like this from the jury.

Defendant's other contention relating to the instructions is a more difficult one to address. Basically what defendant is arguing is that the court's instructions did not really make it clear to the jury that it should find defendant not guilty if it found that at all times during the attack he really thought he was protecting his friend from an offense against him. The state's response is that the court's instructions were correct statements of all the relevant principles and that the court was under no obligation to tie it all together and make it clear to the jury because "tying the instructions and facts together in a cogent form is one of the functions of final argument."

We disagree with the suggestion that the trial court has no obligation to try to clearly instruct the jury on precisely what it is that the jury has to decide. In *State v. Thurston*, 299 Minn. 30, 35, 216 N.W.2d 267, 270 (1974), this court, in reversing and granting a new trial on other grounds, indicated that a trial court has an obligation not just to read statutes but also to explain the elements of the offense.

In this case the trial court's instructions did not make it clear to the jury that it should find defendant not guilty if it found that defendant had acted with a reasonable and actual belief that his friend, Stenstrop, was being assaulted. In fact, in view of the instruction that as a matter of law the officers had acted lawfully, the jury may have mistakenly been led to believe that as a matter of law there was no merit to defendant's theory of the case. In other words, while that instruction may have been justified, it may have had a tendency to mislead when it was combined with the court's other instructions.

Under all the circumstances, we hold that the trial court's erroneous admission of evidence and the inadequate and possibly misleading instructions require a new trial. Although one might characterize the evidence of defendant's guilt as strong, the test is not the strength of the state's evidence but whether it is likely that the errors substantially influenced the jury to convict. The strength of the evidence is only one factor in applying this test. Here we believe that, notwithstanding the strength of the state's evidence, a retrial is necessary because of the likelihood that the two major errors which we have discussed played a significant role in influencing the jury to convict.

Reversed and remanded.