Randall LaMERE, Petitioner, Appellant,

v.

STATE of Minnesota, Respondent.

No. 48954.

Supreme Court of Minnesota.

April 13, 1979.

553

C. Paul Jones, Public Defender, and J. Christopher Cuneo, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Gary W. Flakne, County Atty., Vernon E. Bergstrom, Chief Asst. County Atty., Appellate Division, and David W. Larson, Asst. County Atty., Minneapolis, for respondent.

WAHL, Justice.

This is an appeal from an order denying petitioner postconviction relief from his 1974 conviction of aggravated assault, Minn.St. 609.225, subd. 2. Petitioner contends (1) that he was prejudiced by the testimony of the arresting officer that he advised petitioner of his rights, (2) that he was prejudiced by the prosecutor's unintentional elicitation of evidence implying that petitioner was a pimp, (3) that the state failed to prove that he used the gun that was seized following his arrest, (4) that the trial court erred in instructing the jury that the gun was a "firearm" as that term is used in the statute defining "dangerous weapon," (5) that the trial court erred in refusing to submit any lesser offenses, and (6) that the trial court's instructions on self-defense were inadequate. We affirm.

This case arose out of a dispute that occurred in a restaurant in downtown Minneapolis at 2 a. m. on April 4, 1974. Petitioner, who was 26 at the time, entered the restaurant with a female juvenile but, instead of sitting with her in the booth to which he escorted her, he sat at the counter. A dispute occurred between the manager of the restaurant and petitioner over petitioner's refusal to sit with the girl. Before leaving, petitioner threatened the manager, saying "There is a contract out on you." A minute or two after he left, petitioner returned, obtained a derringer from the girl's purse, and walked up to the manager, pointing the gun at his head. It is not clear whether petitioner pulled the trigger but it is undisputed that the gun did not discharge and that in a split second petitioner ran out the door. Moments later police, who gave chase, captured petitioner a short distance away. Near him they found the derringer, which petitioner had abandoned. It was in several pieces, having broken upon impact with the street.

1. Petitioner's first contention is that he was prejudiced by the testimony of the arresting officer that he had "conducted a patdown search of [petitioner], handcuffed him, and *advised him of his rights.*" (Italics supplied.) Petitioner contends that the likely effect of this was to focus the jury's thinking on why there was no testimony relating to his having been questioned by police and that the inference the jury likely drew was that he had been questioned but that he had either exercised his right to silence or that what he had said was suppressed.

Petitioner relies primarily on this court's decision in *State v. Beck*, 289 Minn. 287, 183 N.W.2d 781 (1971). In *Beck* we held that it was prejudicial error under the facts of that case for the trial court to admit needless testimony of an arresting officer that he had advised the accused of his right to remain silent and that anything he said might be used against him. We reasoned that this evidence, when not elicited as foundation for admission of any out-of-court statement by defendant, might have led the jury to infer that defendant had refused to talk with police and that he did so because he was guilty.

The *Beck* case is still good law,[1] but there are a number of ways in which the case can be distinguished. First, in *Beck*, the officer specifically recited the rights that he had read to defendant. Here the officer did not summarize what he had told petitioner, nor did he ever use the phrase "*Miranda* warning." Second, the testimony in *Beck* was apparently intentionally elicited, and the trial court had an opportunity to prevent the error because the opinion stated that the evidence was admitted "over clearly stated objections." Here, the testimony was apparently unintentionally

1. See, *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), where the court held that a prosecutor's use for impeachment purposes of a defendant's silence at the time of arrest after receiving a *Miranda* warning violated due process. One of the implications of the *Doyle* case would seem to be that it is also improper even to elicit evidence that a *Miranda* warning was given, unless the evidence was necessary as a foundation for the admission of a statement by the defendant.

elicited. Third, the evidence in the *Beck* case was close on the issue of identification. Here, the evidence of petitioner's guilt was overwhelming. We believe that allowing the arresting officer to testify that he had advised petitioner of his rights was error, but that it was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

■■■ 2. Petitioner next contends that he was prejudiced by the prosecutor's unintentional elicitation of evidence that one of the reasons the manager asked petitioner to sit in the booth was that he did not allow "hustling" in the restaurant.

The manager was of the opinion that petitioner was a pimp and that that was why petitioner left the girl alone in the booth. Evidence of this was excluded on relevancy grounds, and the record indicates that the prosecutor, in questioning the manager, was not trying to elicit anything about hustling or pimping. In fact, and in accordance with the ruling of the court, she had cautioned the witness.

Basically, then, this is a case involving the unintentional elicitation of evidence ruled inadmissible. Our main concern, therefore, is with the issue of whether petitioner was prejudiced by the evidence. Our conclusion is that he was not. For one thing, the evidence which was properly admitted might well have prompted the jury to infer on its own that petitioner was a pimp. The evidence indicated that the girl was only 13 or 14, whereas petitioner was 26, and that he left her in the booth by herself and not at the counter. Petitioner himself testified that he had two different girls with him that night, and he did not testify to having a job. We are inclined to conclude that the jury would have inferred petitioner's occupation even if the manager had not implied he was a hustler. If they had not inferred it from petitioner's testimony, it is likely that they probably did not understand what the manager meant by "hustling." Because the evidence of petitioner's guilt was so overwhelming, a reversal on this ground alone could not be justified.

■■ 3. Petitioner next claims that the state failed to prove that he used the gun. There is no merit to this contention.

Numerous witnesses testified that he used a derringer, he did not deny it, and such a gun was found within a few feet of where he was arrested.

■■ 4. A more difficult issue, whether an inoperable firearm is a "firearm" and therefore a "dangerous weapon," is one that was created by the trial court's decision to instruct the jury that the derringer found near petitioner was a "firearm." The trial court gave this instruction because it believed that the gun was a "firearm" regardless of whether it was operable. Petitioner argues that an inoperable firearm is no longer a "firearm" and that even if the derringer was a "firearm," the instruction was unwarranted because it interfered with his right to have the jury decide if the gun was a "dangerous weapon," and confusing because it implied that the court believed the state's evidence had linked him to the gun as a matter of law.

Minn.St. 609.02 subd. 6, defines "dangerous weapon" as follows:

> " 'Dangerous weapon' means any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or great bodily harm, or any other device or instrumentality which, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm."

There are no Minnesota cases dealing precisely with the issue of whether a firearm which is rendered inoperable is still a "firearm" and, therefore, a "dangerous weapon" if it is used in a robbery or an assault. However, other cases of this court dealing with the definition of "dangerous weapon" are relevant because they illustrate the expansive interpretation we are inclined to give the statute.

One example is *State v. Moss*, 269 N.W.2d 732 (Minn.1978), where the issue was whether a person could be convicted of aggravated robbery if he kept his "dangerous

weapon" in his pocket and did not use it. In affirmatively answering this question, we stated as follows:

"The definition of 'dangerous weapon' in § 609.02, subd. 6 creates three categories: (1) firearms, loaded or unloaded; (2) devices designed as weapons and capable of producing death or great bodily harm; and (3) devices which, in the manner used or intended to be used, are calculated or likely to produce death or great bodily harm.

"Reading § 609.02, subd. 3 in connection with the armed robbery portion of the aggravated robbery statute, § 609.-245, we think it is clear that a defendant who has either the first or second type of weapon on his person during the robbery commits armed robbery whether or not he uses the weapon or intends to use it. A different standard applies when the defendant personally possesses at the time of the robbery an item which is not designed as a weapon but which, in the manner used or intended to be used, is calculated or likely to produce death or great bodily harm. Such a person should be deemed to have committed armed robbery if it can be shown that while committing the robbery he displayed or used the item as a weapon or intended to use it as such if its use became necessary." 269 N.W.2d 735.

Another example is *State v. Seifert*, 256 N.W.2d 87 (Minn.1977). In that case the defendant, relying on the traditional definition of a "firearm" as a gun that uses gunpowder to fire the projectile, argued that his $CO_2$ gun was not a "firearm." In rejecting this contention we stated as follows:

"In our opinion, the fact that the gun defendant used required gas rather than gunpowder to discharge its projectile does not mean, as defendant contends, that the gun could not be a firearm within the meaning of the term 'firearm' used in § 609.02. Having statutory purpose in mind, we think that term should be defined broadly to include guns using newer types of projectile propellants and should not be restricted in meaning to

guns using gunpowder. In this respect we note that § 97.40, subd. 34, defines 'firearms' for purposes of game and fish laws as 'any gun from which shot or a projectile is discharged by means of an explosive, gas, or compressed air.' The gun used by defendant might also qualify as a dangerous weapon under the alternative test contained in § 609.02 ('any device designed as a weapon and capable of producing death or great bodily harm')." 256 N.W.2d 88.

In this case we could refuse to reach the issue of whether an inoperable firearm is a "firearm" because there was no evidence that the gun was inoperable at the time petitioner allegedly used it. The difficulty with this approach, however, is that, while the evidence indicated that petitioner broke the gun when he threw it on the pavement moments before he stopped running, there was also testimony that he had pulled the trigger and the gun had clicked. One could infer from this latter testimony that the gun might have been defective at the time of the assault.

Accordingly, we believe it is necessary to reach the issue, and we hold that a firearm manufactured as such is a "firearm" even if there is some mechanical defect which renders it temporarily inoperable. There are two main reasons why the statute specifies that a "firearm" is a "dangerous weapon" whether it is loaded or unloaded. First, so long as a firearm has the apparent ability to inflict injury, the victim of an assault or robbery will respond in the same way whether or not the gun is loaded. An unloaded firearm has the same capacity to create fear and/or to cause people to comply with criminal demands as a loaded one. Second, if a firearm were not a "firearm" when it was unloaded, great difficulties would be created for prosecutors because of the difficulty of producing any direct evidence that the gun used was in fact loaded. These factors justify treating a firearm as a "firearm" even if it was temporarily inoperable at the time of the offense because of a defect. In saying this, we wish to make it clear that this decision does not include toy

guns, simulated guns, or blank starter pistols. We are concerned with a firearm which was designed by the manufacturer for use as a firearm and which continues to look like a firearm but for some mechanical reason is technically, if only temporarily, inoperable. In such a situation, and this is such a situation, the gun should still be considered a firearm, and both the trial court and the postconviction court applied this interpretation of the statute.

A related issue is petitioner's contention that even if an inoperable firearm is a "firearm," the instruction was improper. There are two parts to this contention.

(a) First, petitioner argues that the instruction was unwarranted because it tended to interfere with the jury's power of lenity.

■ There are a number of cases from other jurisdictions which uphold the right of a trial court to instruct the jury that a particular gun was a "dangerous weapon" under the statutory definition of "dangerous weapon" in use in that jurisdiction. See, e. g., *State v. Ashland*, 259 Iowa 728, 145 N.W.2d 910 (1966). We agree with petitioner, however, that generally a trial court should not instruct the jury that an uncontradicted fact exists when that fact constitutes an essential element of the offense. As this court stated in *State v. Carlson*, 268 N.W.2d 553, 560 (Minn.1978):

> "The general rule is that a jury has a power of lenity and can bring in a not guilty verdict in the teeth of the facts. While it does not follow from this principle that a defendant is entitled to have all lesser-included offenses submitted even if the evidence does not reasonably warrant their submission, it does follow that he is entitled to have all the elements of the offense with which he is charged submitted even if the evidence relating to these elements is uncontradicted."

If a petitioner actually admits certain elements, then the court properly may so instruct the jury. Id.

■ Here, petitioner did not admit that the gun was a "dangerous weapon" and, therefore, the court should have instructed the jury on the definition of "dangerous weapon." The court should have explained that a firearm may still be a "firearm" even if it is unloaded or temporarily inoperable at the time it is used. On the other hand, we do not think that a new trial is required, because even if the trial court had instructed the jury as we have indicated, the result would have been the same.

■ (b) Petitioner's other argument, that the instruction was confusing, is based on petitioner's belief that the instruction may have given the jury the impression that the court believed that the state had linked petitioner to the derringer as a matter of law. This is one of the dangers that a court risks when it gives the kind of instruction given in this case. See, *State v. Carlson, supra*, holding that an instruction of this nature, while it was justified, may have misled the jury into believing that as a matter of law there was no merit to defendant's theory of the case. In this case we cannot conclude that the jury was confused. The trial court did not instruct the jury that petitioner was armed with the derringer, only that the derringer was a "firearm" and, therefore, a "dangerous weapon." The court did instruct the jury that one of the elements which the state had to prove was that a dangerous weapon was used. In addition, petitioner did not claim that the derringer found by the police was not the gun he had used; rather, he tried to convince the jury that he had used it and pointed it at the manager in self-defense to prevent an assault by the manager.

5. Petitioner also contends that the trial court erred in refusing to submit any lesser offenses. At trial, defense counsel requested submission of simple assault, Minn.St. 609.22, and, failing that, submission of the offense of intentionally pointing a gun at a human being, Minn.St. 609.66, subd. 1(2).

■ The rule is that a trial court must submit a lesser-included offense only if there is evidence which produces a rational basis for a verdict acquitting defendant of

**558**

the offense charged and convicting him of the lesser offense. *State v. Leinweber*, 303 Minn. 414, 228 N.W.2d 120 (1975).[2]

 In this case, the offense of simple assault is necessarily included in the offense of assault with a dangerous weapon because it is impossible to commit the latter without also committing the former. The same may not be said of the offense of pointing a gun at a human being, because one can commit assault with a dangerous weapon by using some weapon other than a gun. Even if one assaults someone with a gun, one may not have actually pointed the gun at the person.

 Whether it was error for the trial court to refuse to submit the lesser included offense of simple assault depends upon whether the jury rationally could find petitioner not guilty of aggravated assault with a dangerous weapon but guilty of simple assault. Here, petitioner admitted that he had a gun in his hand. As a result, the jury's attention was diverted to the issue of self-defense. The trial court did not abuse its discretion in concluding that petitioner was guilty as charged or not at all. See, *State v. Briggs*, 256 N.W.2d 305 (Minn. 1977).

6. Petitioner's final contention is that the trial court's instructions on self-defense were inaccurate. There is no merit to this issue.

Affirmed.

---

**2.** Recent cases illustrating the application of this test include: *State v. Nesgoda*, 261 N.W.2d 356 (Minn.1977); *State v. McDonald*, Minn., 251 N.W.2d 705 (1977); and *State v. Malzac*, 309 Minn. 300, 244 N.W.2d 258 (1976).