STATE OF MINNESOTA

IN SUPREME COURT

A21-1648

Court of Appeals                                              Chutich, J.
                                    Dissenting, Thissen, J., Gildea, C.J.,
                                                          Anderson, J.

State of Minnesota,

                    Respondent,

vs.                                          Filed:  September 27, 2023
                                             Office of Appellate Courts

Corey Lynden Stone,

                    Appellant.

_____

Keith Ellison, Attorney General, Lisa Lodin Peralta, Assistant Attorney General, Saint Paul, Minnesota; and

Erica Madore, Mille Lacs County Attorney, Milaca, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Eva F. Wailes, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.      Under Minnesota Statutes section 609.165, subdivision 1b(a) (2022), which criminalizes the possession of a firearm by a person convicted of a crime of violence, a group of disassembled and incomplete shotgun parts can be a "firearm"—an instrument designed for attack or defense that expels a projectile by some explosive force.

1

2.      The evidence is sufficient to support appellant's conviction under Minnesota Statutes section 609.165, subdivision 1b(a), despite the firearm being disassembled and incomplete.

Affirmed.

O P I N I O N

CHUTICH, Justice.

The issue in this case is whether a group of disassembled shotgun parts lacking a connecting stock bolt and washer is a "firearm" under the law that prohibits certain people convicted of a felony from possessing firearms, Minnesota Statutes section 609.165, subdivision 1b(a) (2022). Law enforcement investigators found a disassembled 20-gauge shotgun in a backpack belonging to appellant Corey Lynden Stone, who is ineligible to possess a firearm because he was previously convicted of a crime of violence. A forensic scientist with the Minnesota Bureau of Criminal Apprehension used a bolt and a washer from a similar firearm to fully assemble and successfully fire the shotgun found in the backpack. A jury found Stone guilty of one count of possession of a firearm by an ineligible person under section 609.165, subdivision 1b(a). In a precedential opinion, the court of appeals affirmed Stone's conviction, concluding that a group of unassembled and incomplete shotgun parts is a "firearm" within the meaning of the statute, so long as it is possible to assemble the parts into a firearm as defined by case law. *State v. Stone*, 982 N.W.2d 500, 508 (Minn. App. 2022). Because a disassembled and incomplete shotgun can meet the plain language definition of a firearm under section 609.165, subdivision

2

1b(a), and the evidence here was sufficient to support Stone's conviction, we affirm the decision of the court of appeals.

## FACTS

The following facts were presented during Stone's jury trial. Police investigators Michael Dieter and Bradley Gadbois drove past "a known drug house" during a routine patrol. The investigators observed a woman holding what appeared to be a hypodermic needle while seated in a sedan parked outside the house. Suspecting her of using heroin, Investigator Dieter went to speak with her.

Meanwhile, Investigator Gadbois approached three people seated in a van parked in the driveway of the house. As he spoke with the driver, Z.R., Investigator Gadbois suspected Z.R. of being deceitful. He also observed marks consistent with drug use on Z.R.'s face. Investigator Gadbois conducted a pat search of Z.R. that revealed a small baggie containing a white residue that appeared to be narcotics. The investigators then searched the van. Inside the van, the investigators discovered a blue hiking backpack that contained shotgun parts. Specifically, Investigator Dieter observed two shotgun barrels and "the remaining parts of a Mossberg 20 gauge" inside the backpack. One of the shotgun barrels appeared to have been sawed off. The backpack also contained a prescription labeled "Corey Lynden Stone" and a paystub in the name of Corey Stone. The backpack had a spot for a daypack to zip on and attach, but the daypack was missing.

Z.R. told the investigators that someone named "Coco" had recently borrowed the van. The investigators knew that Coco is Stone's nickname.[1] Z.R. said that Coco left the blue hiking backpack in the van. He showed the investigators text messages that he exchanged with a contact named Coco, in which Z.R. said, "I need my van."[2] Coco then sent several responses, including, "I hope you ain't tryna run off with all my sh*t like that homie . . . Im over here flipping out pissed off right now . . . ."

While the investigators were questioning Z.R., Stone was not present in the van or at the house. Other officers located him at a nearby park and radioed his location to the investigators. When he approached Stone, Investigator Dieter observed that Stone was carrying the blue daypack that appeared to attach to the blue hiking backpack found in the van.

Stone is ineligible to possess a firearm based on a prior conviction for a crime of violence. Respondent State of Minnesota charged Stone with possession of a firearm by an ineligible person under Minnesota Statutes section 609.165, subdivision 1b(a).

The group of disassembled shotgun parts found in the blue hiking backpack was sent to the Minnesota Bureau of Criminal Apprehension for examination. The group of parts included: (1) a shortened stock; (2) a shotgun receiver;[3] (3) two shotgun barrels (one

[1]     Each investigator testified that they knew Coco was Stone's nickname based on prior dealings with him and viewing his social media accounts.

[2]     On Z.R.'s phone, the contact was spelled "Coacoa." For consistency, we use the spelling "Coco."

[3]     Federal regulations define "receiver" in relevant part as "the part of a . . . shotgun . . . that provides housing or a structure for the primary component designed

full-length and one sawed-off); and (4) the piece of the sawed-off barrel. The shotgun parts were identified as a Mossberg Model 500C 20-gauge shotgun with serial number R534861. The Bureau of Criminal Apprehension report notes that it received the shotgun "disassembled" and that "the stock bolt and stock bolt washer . . . were not present." According to the report, a forensic scientist took a bolt and bolt washer from a reference firearm and used the two items to assemble the stock to the receiver of the shotgun. The shotgun was test fired and "found to be functional."

The case proceeded to a jury trial. The State called three witnesses to testify: Investigator Dieter, Investigator Gadbois, and the officer who located Stone in the nearby park. Investigator Dieter testified that he did not believe the shotgun would have fit in the backpack without being disassembled; otherwise, it would have protruded from the top. The parties stipulated to the admission of the Bureau of Criminal Apprehension report into evidence. The State did not call a forensic scientist from the Bureau or any other expert witness to testify about the operability of the shotgun or the necessity of the added stock bolt and washer. Stone did not call any witnesses and did not testify.

The parties and the district court had several discussions regarding whether the shotgun parts were a "firearm" under Minnesota Statutes section 609.165 (2022). The district court concluded that the jury needed to decide whether the parts were a firearm under the statute. Stone argued that the jury should be instructed that the firearm here was

_____

to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent), even if pins or other attachments are required to connect such component to the housing or structure." 27 C.F.R. § 478.12(a)(2) (2022).

5

incomplete due to the missing stock bolt and washer, and therefore it was "free to decide whether or not this particular firearm was a firearm because it was missing pieces."

The court did not give Stone's requested instruction. Instead, the jury received the following final instruction: " 'Firearm.' Means a device, whether operable or inoperable, loaded or unloaded, designed to be used as a weapon from which can be expelled a projectile by the force of any explosion or force of combustion." The district court declined to draw a distinction between "inoperable" and "incomplete," particularly because no testimony was offered on the necessity of the missing parts to the firearm's operability. The court noted that the distinction was "logic that the jurors can parse." During closing arguments, Stone's trial counsel highlighted that the group of shotgun parts was missing pieces and told the jury, "It's for you to decide whether this was a firearm." The jury found Stone guilty.

Stone raised several issues on appeal, including that the disassembled group of shotgun parts, which was missing a bolt and a washer, was not a "firearm" within the meaning of the illegal possession statute. In a precedential opinion, the court of appeals concluded that "the potential use of an unassembled firearm is sufficient to bring such a firearm within the meaning of prohibited possession under Minn. Stat. § 609.165, subd. 1b(a), so long as it is possible to assemble the firearm." *Stone*, 982 N.W.2d at 508. The court of appeals observed that a firearm has been defined by this court as "an instrument designed for attack or defense that expels a projectile by the action or force of gunpowder, combustion, or some other explosive force." *Id.* at 507 (quoting *State v. Glover*, 952 N.W.2d 190, 191 (Minn. 2020)). Based on our precedent, the court of appeals

6

observed that the operability of the instrument is immaterial to determining whether it is a firearm. *Id.* (citing *LaMere v. State*, 278 N.W.2d 552, 555–56 (Minn. 1979); *Gerdes v. State*, 319 N.W.2d 710, 712 (Minn. 1982)). To address Stone's concern that "at some point, a 'firearm' missing components clearly ceases to be a firearm," the court of appeals concluded that the determination of what is a firearm is a question of fact for the jury and should be "based on jury instructions that define 'firearm' consistent with caselaw and explain that a group of unassembled firearm parts can constitute a firearm, so long as it [is] possible to assemble the firearm." *Id.* at 508–09.

We granted Stone's petition for further review.

### ANALYSIS

Stone contends that the evidence supporting his conviction for illegal possession of a firearm is insufficient because a group of unassembled and incomplete shotgun parts is not a "firearm" within the meaning of section 609.165, subdivision 1b(a). A claim of insufficient evidence that turns on the meaning of the statute under which the defendant was convicted presents an issue of statutory interpretation that we review de novo. *State v. Pakhnyuk*, 926 N.W.2d 914, 920 (Minn. 2019). Once the statute is interpreted, we conduct "a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Powers*, 962 N.W.2d 853, 857–58 (Minn. 2021) (quoting *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989)). We address each part of this analysis in turn.

7

I.

Stone was convicted under Minnesota Statutes section 609.165, subdivision 1b(a), which states in relevant part: "Any person who has been convicted of a crime of violence, as defined in section 624.712, subdivision 5, and who ships, transports, possesses, or receives a firearm or ammunition, commits a felony . . . ."[4] Because the term "firearm" is not defined within the statute or in the criminal code generally, we "may look to other interpretive tools to determine its meaning, including dictionary definitions." *State v. Glover*, 952 N.W.2d 190, 193 (Minn. 2020). If the language is unambiguous, then we apply the plain meaning. *Powers*, 962 N.W.2d at 858. But if the language is subject to more than one reasonable interpretation, and therefore ambiguous, then we apply various canons of statutory construction to determine the meaning. *Pakhnyuk*, 926 N.W.2d at 920.

Neither party asserts that the term "firearm" in the illegal possession statute is ambiguous. Each party maintains, however, that the court of appeals' plain language interpretation of the word "firearm" is incorrect because it improperly focuses on the potential *use* of the instrument. Stone argues that under the plain meaning of the word "firearm," a group of unassembled and incomplete parts is not a weapon or instrument. According to Stone, without some of the parts, the remaining parts cannot be assembled into a firearm to either brandish as a weapon or to fire.

---

[4]    Minnesota Statutes section 624.712, subdivision 5 (2022), defines "crime of violence" as felony convictions for the most serious offenses, including, but not limited to, murder, manslaughter, assault, and domestic assault.

8

The State counters that because section 609.165 criminalizes the *possession* of a firearm by a person previously convicted of a crime of violence, it is irrelevant whether the firearm can be brandished or fired. The State maintains that the proper inquiry focuses on the *design* of the device as a weapon, not its operability or completeness. The State cites cases from other jurisdictions to contend that even when a firearm is missing parts or is disassembled—or both—those circumstances do "not change that [the firearm] was designed for attack or defense in the manner of expelling a projectile by explosive force."

We have previously examined and defined the term "firearm" based on its plain and ordinary meaning. In *State v. Haywood*, the defendant was charged with possession of a firearm by an ineligible person under the same statute at issue in this case, section 609.165, subdivision 1b. 886 N.W.2d 485, 487 (Minn. 2016). We defined the term "firearm" to include only those "weapons that use explosive force." *Id.* at 490. We therefore held that an *air-powered* BB gun is not a "firearm" under the illegal possession statute. *Id.*

We again examined the meaning of a "firearm" in the context of Minnesota Statutes section 624.713, subdivision 1 (2018), which also prohibits possession of a firearm by certain persons, in *Glover*, 952 N.W.2d 190.[5] We determined that a device must be a

---

[5] Section 624.713, subdivision 1, states in relevant part:

> The following persons shall not be entitled to possess ammunition or a pistol or semiautomatic military-style assault weapon or, except for clause (1), any other firearm: . . .

> (2) . . . a person who has been convicted of, or adjudicated delinquent or convicted as an extended jurisdiction juvenile for committing, in this state or elsewhere, a crime of violence.

"weapon" to be considered a "firearm."[6] *Glover*, 952 N.W.2d at 194. We then looked to the plain meaning of the word "weapon" and concluded that a "weapon" is "ordinarily understood to be an instrument designed for attack or defense." *Id.* We therefore defined "firearm" in a *possession* context as "a weapon, that is, an instrument designed for attack or defense, that expels a projectile by the action or force of gunpowder, combustion, or some other explosive force." *Id.* at 195. Applying this definition to the facts of *Glover*, we held that a distress flare launcher is not a firearm because it is designed as an alert mechanism in emergency situations, not as a weapon. *Id.* at 194.

Our reasoning in *Glover* is instructive here. Similar to section 624.713, section 609.165 criminalizes the *possession* of a firearm, rather than the *use* of a firearm. *See Glover*, 952 N.W.2d at 195 ("Minn. Stat. § 624.713, subd. 1, establishes a possession crime, not a crime based on a defendant's use or intended use. . . . The Legislature did not use the phrase 'use or intend to use' in the statute."). Further, sections 624.713 and 609.165 prohibit the same class of persons from possessing a firearm—those who have been convicted of a crime of violence. Given the similarities of the statutes, we will apply the definition of "firearm" that we applied in *Glover* to this case.

---

[6] In *Glover*, we looked to the following dictionary definitions of "firearm": "weapon from which a shot is discharged by gunpowder," *Firearm*, *Merriam-Webster's Collegiate Dictionary* 471 (11th ed. 2014); "small arms weapon, as a rifle or pistol, from which a projectile is fired by gunpowder," *Firearm*, *The Random House Dictionary of the English Language* 722 (2d ed. 1987); "[a] weapon that expels a projectile (such as a bullet or pellets) by the combustion of gunpowder or other explosive," *Firearm*, *Black's Law Dictionary* 710 (9th ed. 2009); and "[a] weapon, especially a pistol or rifle, capable of firing a projectile and using an explosive charge as a propellant," *Firearm*, *The American Heritage Dictionary of the English Language* 661 (5th ed. 2011). *See Glover*, 952 N.W.2d at 193.

10

A shotgun itself clearly meets this definition—shotguns are produced for the specific end of firing slugs or shotshells for attack or defense. The question then becomes, if someone disassembles a firearm and takes away two of its parts, do they change the *design* of that firearm, such that it is no longer a weapon or instrument "designed for attack or defense, that expels a projectile by the action or force of gunpowder, combustion, or some other explosive force"? *Glover*, 952 N.W.2d at 195. In other words, was the shotgun intentionally adapted into something that has a purpose other than attack or defense?

Take, for example, a musical instrument such as a clarinet that is commonly disassembled for transport. Upon viewing the unassembled clarinet parts in their case, a reasonable person would surely still consider the unassembled clarinet to be a musical instrument. The clarinet may even be missing an essential part—such as a reed—and could still be properly considered a musical instrument because it did not lose its *design*. Indeed, the requisite parts themselves were *designed* to be taken apart for easy transport or storage and put back together for use as an instrument. The same holds true when a person convicted of a crime of violence possesses the integral parts unique to a firearm in an unassembled state in the same container, even though a part is missing.

Stone attempts to distinguish his case from this court's precedent that focused on *assembled*, yet inoperable or incomplete, firearms. *LaMere v. State*, 278 N.W.2d 552 (Minn. 1979); *Gerdes v. State*, 319 N.W.2d 710 (Minn. 1982). Stone contends that when a firearm is incomplete *and* disassembled, concerns about the effect of the inoperable firearm on others are no longer present because the disassembled parts are not "inherently threatening," like a complete firearm.

11

Stone's arguments focusing on the operability of the firearm as a weapon or its ability to be brandished are unconvincing because they contemplate *use*. Previously, in a case involving the use of a firearm in an aggravated assault, this court was concerned with the possibility of a firearm instilling fear in a victim, even if it was inoperable. *LaMere*, 278 N.W.2d at 556. We concluded that a firearm need not be operable to support a conviction for aggravated assault. *Id.* ("[W]e hold that a firearm manufactured as such is a 'firearm' even if there is some mechanical defect which renders it temporarily inoperable."). Importantly, we reasoned that an inoperable firearm is still capable of instilling fear of bodily harm in a victim when "a firearm which was designed by the manufacturer for use as a firearm and which continues to look like a firearm but for some mechanical reason is technically, if only temporarily, inoperable." *Id.* at 556–57.

After *LaMere*, we held that operability was immaterial to support a conviction for possession of a short-barreled shotgun under Minnesota Statutes section 609.67, subdivision 2 (1980), in *Gerdes*, 319 N.W.2d at 712. We reasoned, "[u]pon examination of section 609.67 we do not find the word 'operable,' nor any indication that such a word should be read into the statute. The statute only addresses *the original design of the weapon* and reflects a strong public policy to dissuade persons from possessing a certain class of dangerous weapons." *Gerdes*, 319 N.W.2d at 712 (emphasis added).

Although incomplete firearm parts are unlikely to instill fear in a victim, that inquiry contemplates the intended *use* of the firearm, rather than the *possession* of a firearm. In enacting section 609.165, the Legislature intended to prohibit persons convicted of a crime of violence from *possessing* firearms for the rest of their lives, regardless of whether the

12

weapon appears threatening or if it is immediately dischargeable. This point is further made clear because section 609.165 criminalizes possession of not just a "firearm," but also "ammunition." There is nothing "inherently threatening" about a bullet, on its own, unaccompanied by any firearm or other means to use it. Stone wrongly tries to add an element that is absent from section 609.165, subdivision 1b(a).

Next, Stone relies on other statutory provisions to show that the Legislature knows how to criminalize components of contraband when it so intends. Although Minnesota Statutes sections 609.66, subdivision 1a(c) (2022), defining "suppressor," and 609.67, subdivision 1(e) (2022), defining "machine gun conversion kit," specifically criminalize the combination of parts for those weapons, the statutes provide explicit definitions of the contraband. Further, they apply to a far more specific contraband than the broader category of firearms, including a non-essential accessory to a weapon (a suppressor). These disparate definitions therefore do not dictate the interpretation of "firearm" in section 609.165.

Further, although Minnesota Statutes section 609.669, subdivision 2(2) (2022), defines the term "firearm" as "any weapon which is designed to or may readily be converted to expel any projectile by the action of an explosive; or the frame or receiver of any such weapon," it does so in the specific and unique context of civil disorder. Minn. Stat. § 609.669, subd. 1 (2022). Namely, the definition in section 609.669 applies only when a person teaches, demonstrates, or trains others in how to use or make any firearm (or explosive or incendiary device) involving "acts of violence by assemblages of three or more persons." Minn. Stat. § 609.669, subd. 2(1). Because this section

13

contemplates a specific *use* of a firearm—including teaching or demonstrating others "how to . . . make any firearm" during a violent public disturbance—we will not graft this definition into the definition of firearm in section 609.165.[7]

Moreover, looking to other statutory provisions is unnecessary. Determining that the unassembled and incomplete shotgun parts are a firearm based on design—rather than use or operability—is supported by the statutory scheme of section 609.165 itself. Section 609.165 specifically prohibits lifetime *possession* of a firearm; it does not prohibit a particular use, whether that be successfully operating or brandishing the firearm. *See, e.g.*, *Glover*, 952 N.W.2d at 195 n.7 ("[A] defendant's use or intended use of a device as a weapon is not relevant to the question of whether an instrument is a 'firearm' under section 624.713."). As the Michigan Supreme Court aptly recognized, reading a completeness requirement into a statute prohibiting convicted felons from *possessing* firearms leads to an alarming result: "convicted felons could legitimately purchase, sell, receive, and distribute handguns on a regular basis, as long as the firing pins had been temporarily removed from those handguns. We cannot conclude that the Legislature intended such a result when it drafted the felon in possession statute." *People v. Peals*, 720 N.W.2d 196,

---

[7] Stone also relies on *expressio unius est exclusio alterius* to argue that these other statutory provisions are indicative of the Legislature's intent. *Expressio unius est exclusio alterius* means "the expression of one thing is the exclusion of another" and reflects the inference that statutory omissions are intentional. *State v. Caldwell*, 803 N.W.2d 373, 383 (Minn. 2011). *Expressio unius* typically looks to the specific statute at issue, not to other statutory provisions. *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107–11 (2012) (providing three examples of judicial application of *expressio unius* within the specific statutes and state constitution at issue). Section 609.165 does not provide a definition of "firearm," so the Legislature likewise did not provide any exceptions. Stone's reliance on *expressio unius*, therefore, is misplaced.

202 (Mich. 2006) (quoting *People v. Brown*, 642 N.W.2d 382, 385 (Mich. App. 2002)). Section 609.165 serves to deter violent felons from possessing firearms "for the remainder of the person's lifetime." Minn. Stat. § 609.165, subd. 1a. Reading a completeness requirement into the definition of a firearm would create a large loophole that would thwart the Legislature's clear purpose in enacting the sweeping lifetime provision. *Cf. Peals*, 720 N.W.2d at 205 ("An extratextual operability requirement would also undermine the legislative intent to deter the possession of firearms by convicted felons and by persons committing felonies. That a gun is inoperable does not alleviate the extreme danger posed by its possession . . . .").

Notably, a person convicted of a crime of violence also violates the statute by shipping, transporting, or receiving a "firearm." Minn. Stat. § 609.165. Narrowly defining "firearm" to require an assembled, complete firearm would enable a person convicted of a crime of violence to ship, transport, or receive firearm parts with impunity—something the Legislature surely did not intend when it imposed the lifetime ban.

In sum, focusing the statutory interpretation analysis on the design of a weapon, rather than its use, operability, current state, or possibility of assembly, is consistent with the ordinary meaning of a "firearm" and our precedent. Such a focus also appears to further the Legislature's clear intention to deter a specific group of dangerous felony offenders from ever again possessing firearms—instruments designed for attack or defense that expel a projectile. Based on our precedents defining "firearm," the statute's criminalization of possession, and the legislative purpose behind a prohibition of possession for offenders who have committed a crime of violence, we hold that a disassembled and incomplete

shotgun can be a firearm under section 609.165, subdivision 1b(a), so long as it is an instrument designed for attack or defense that expels a projectile by some explosive force.

## II.

Next, we apply our interpretation of the term "firearm" to the facts here to see whether sufficient evidence supports Stone's conviction. As a threshold matter, Stone argues that the question of whether the disassembled and incomplete shotgun parts constituted a firearm is a question of law and that it was error for the district court to submit the question to the jury. The court of appeals held that the inquiry was a question of fact properly left to the jury rather than requiring the court to "attempt[] to craft a rule of law that adequately addresses the plethora of fact patterns that could be presented in a case involving an unassembled firearm that is missing one or more parts." *Stone*, 982 N.W.2d at 508–09. The State agrees with the court of appeals, asserting that "[w]hen a weapon falls within the definition of a 'firearm' based on its design – even if inoperable based on being disassembled, being broken, missing pieces, or some combination – it is a question for the factfinder whether the weapon satisfies the 'firearm' element of Minn. Stat. § 609.165, subd. 1b(a)." We agree as well.

Generally, "a trial court should not instruct the jury that an uncontradicted fact exists when that fact constitutes an essential element of the offense." *LaMere*, 278 N.W.2d at 557. In *Glover* and *Haywood*, we interpreted the word "firearm" de novo and applied the interpretation to the evidence in each case. 952 N.W.2d at 193; 886 N.W.2d at 488. In *LaMere*, we noted that the defendant did not admit that the gun at issue was a "dangerous weapon" under the statute at issue, so the district court should have instructed *the jury* on

16

the definition of a dangerous weapon and allowed the jury to make the factual determination. 278 N.W.2d at 557.

It is undisputed that the group of parts found in the blue hiking backpack were shotgun parts—the stock, the receiver, and two barrels—so this court can readily determine that the assembled shotgun fits within the statutory definition of a "firearm" because a shotgun is an instrument *designed* for attack or defense that expels a projectile by the action or force of gunpowder, combustion, or some other explosive force.

This initial determination does not mean that a shotgun or its parts can never be redesigned or altered into something other than a firearm—the weapon's initial design is not an immutable characteristic. A shotgun could be *so* damaged, incomplete, or altered that it has completely lost its characteristics of a weapon designed to fire a projectile. And the opposite is equally true: "[S]urely the government doesn't think that a felon who owns a gun that started life as a toy gun but now shoots real bullets can't be convicted of being a felon in possession." *United States v. Dotson*, 712 F.3d 369, 372 (7th Cir. 2013). Other jurisdictions that focus on the design of the instrument have acknowledged that "[c]ommon sense and experience leave no room for doubt that an instrument originally designed, made, and intended to expel a projectile by force of an explosion can lose this characteristic in many ways such that it would no longer be fairly considered a firearm." *Armstrong v. Commonwealth*, 562 S.E.2d 139, 145 n.6 (Va. 2002).

At trial, the defendant can raise reasonable doubt by showing that a firearm was intentionally adapted to serve a different purpose. The Supreme Court of Virginia set forth this process:

17

Contrary to [the defendant's] assertions, the Commonwealth did not have the burden of disproving that the handgun lost its characteristics as a firearm. The Commonwealth had the burden of presenting *prima facie* evidence on all elements of the crime charged and, once the Commonwealth met that burden, [the defendant] had the option of presenting evidence raising a reasonable doubt regarding one or more of those elements. However, the ultimate burden of persuasion always remained on the Commonwealth and if, considering the evidence as a whole, both for the Commonwealth and [the defendant], there existed a reasonable doubt of his guilt, he was entitled to be acquitted of the offense.

*Kingsbur v. Commonwealth*, 593 S.E.2d 208, 210 (Va. 2004).

Here, the jury instruction given was consistent with our case law, defining a "firearm" as "a device, whether operable or inoperable, loaded or unloaded, designed to be used as a weapon, from which can be expelled a projectile by the force of any explosion or force of combustion." The instruction did not focus on the possibility of assembling the group of shotgun parts, but as discussed above, it did not need to do so. Further, Stone's trial counsel sought to raise a reasonable doubt regarding the group of parts losing its qualities of a firearm in his closing argument: "This particular gun was missing [a] couple pieces, and it's in the BCA report. . . . And at what point [do] pieces of a firearm become [a] firearm? If it's – if it's missing some pieces, is it still a firearm? That's for you [the jury] to decide, but that's another reasonable doubt."

The State met its burden to prove that, beyond a reasonable doubt, the shotgun parts were designed as a weapon for attack or defense that expels a projectile. To be sure, no evidence was presented as to how essential the bolt and the washer were to the gun's operation. But such a fact seems unnecessary for the jury to have concluded that the stock, receiver, and two barrels were a firearm. The investigators readily identified the group of

18

shotgun parts found in Stone's backpack as a Mossberg Model 500C 20-gauge shotgun. The State presented the Bureau of Criminal Apprehension report stating that a forensic scientist took a bolt and bolt washer from a similar shotgun and used the two items to fasten the stock to the receiver of the shotgun. The shotgun then fired and was "found to be functional." The record contains no evidence that Stone adapted the parts to effectuate a particular end, purpose, or plan for the shotgun parts to be anything other than a weapon. *See Douglas v. State*, 986 N.W.2d 705, 710 (2023).

Ultimately, the district court properly allowed the jury to decide whether the shotgun parts had been so changed or were so incomplete that they were no longer a firearm. The record shows that the evidence, viewed most favorably to the conviction, was sufficient for the jury to reach the commonsense verdict that it did. *See Powers*, 962 N.W.2d at 857–58.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.

D I S S E N T

THISSEN, Justice (dissenting).

The question before us is one of first impression: Does a person who possesses an incomplete collection of firearm parts possess a firearm for purposes of Minn. Stat. § 609.165, subd. 1b(a) (2022)? Because I conclude that the answer to that question is no, I respectfully dissent. Consequently, I would reverse appellant Corey Stone's conviction for illegal possession of a firearm.

My reasoning is simple. The statute prohibits possession of an object called a firearm—a weapon designed to be used for attack or defense. *State v. Glover*, 952 N.W.2d 190 (Minn. 2020). The reason the Legislature prohibits persons who have been convicted of a crime of violence from possessing a firearm is because it is concerned that the person will use the firearm as a weapon and hurt someone. A person who has some of, but not all of, the parts of a firearm such that the firearm cannot be assembled sufficiently to be used as designed—as a weapon—does not possess a firearm.

GILDEA, Chief Justice (dissenting).

I join in the dissent of Justice Thissen.

ANDERSON, Justice (dissenting).

I join in the dissent of Justice Thissen.

D-1