## STATE v. CHRISTIAN F. VIRGENS.[1]

### February 19, 1915.

### Nos. 18,711—(1).

**Criminal law — evidence — books and records of foreign corporation.**

1. The books and records of a large mercantile establishment, situated outside the state, when properly identified as the books and records kept in the usual course of business, may be received in evidence in a criminal trial without being verified by the clerks who actually made the entries. It is for the trial court to determine whether sufficient foundation for the introduction of such books has been laid, and the ruling will not be reversed unless abuse of judicial discretion is made to appear.

**Opinion evidence.**

2. A witness who has observed the appearance and manner of speech of a

---

[1] Reported in 151 N. W. 190.

Note.—The authorities on the general question as to the admissibility of non-expert opinion as to mental capacity are gathered in a note in 19 L.R.A. 721.

person may therefrom be permitted to testify to the opinion formed con-
cerning the mental state of such person.

### Cross-examination of defendant.

3. Defendant on trial for murder, by the cross-examination of the state's
witnesses, insinuated that a witness and defendant's wife desired convic-
tion; and when defendant took the stand he accused them of criminal
intimacy. In this situation, it was proper cross-examination of defendant
to elicit that he claimed that, at the time of the commission of the crime,
his wife was with him at home, and no impropriety in asking him in view
of his accusation if he would consent to the wife testifying.

### Address of county attorney — allusion to desired witness.

4. It was not misconduct of the county attorney, in his opening address,
to state what he expected to prove, and which he did prove without objec-
tion. Nor was it prejudicial misconduct of such attorney, in his closing
address, to allude to the desire of the state to have had defendant's wife
as a witness under the circumstances of this case. An improper reference
to the change of venue was rendered harmless by the court's instruction not
to consider it.

### Charge to jury — verdict.

5. The court's charge was correct, and the evidence, though circumstantial,
sustains the conviction.

Defendant was indicted by the grand jury of Martin county, tried
in the district court for Faribault county before Quinn, J., and a
jury, and convicted of the crime of murder in the first degree. From
the judgment of conviction, sentencing defendant to imprisonment
in the state prison for life, defendant appealed. Affirmed.

*Albert R. Allen* and *S. D. O'Neill,* for appellant.

*Lyndon A. Smith,* Attorney General, *John C. Nethaway,* Assist-
ant Attorney General, and *E. C. Dean,* County Attorney, for re-
spondent.

HOLT, J.

Christian F. Virgens was indicted, tried and convicted of murder
in the first degree, the victim being John Steen.

John Steen was a middle aged farmer residing upon a farm about
a half mile east of the village of Triumph, Martin county, this state.
His home had been there for many years. About 10:30 o'clock in

424          128 MINNESOTA REPORTS

the evening of May 7, 1913, he left the bedroom of his wife, lit a lantern, and went to his hog-house to care for a brood-sow. Early the next morning he was found dead in one of the pens. Death came from a bullet which entered the top of his head, passed down through the brain and lodged near the right clavicle. The testimony is such that it excludes all possible theories that the wound was self inflicted or accidental. Unquestionably John Steen was the victim of a cold-blooded murder and the only propositions to be considered on this appeal are: Does the properly admitted evidence warrant the jury in finding the defendant guilty thereof, and was there a fair trial, free from prejudicial error?

The defendant was a farmer, 37 years of age. He owned a valuable 160-acre farm, adjoining John Steen's on the east and had resided thereon for eight years prior to the homicide. He had been married about two years, and his wife was 21 years old. Evidence was adduced tending to show that defendant considered John Steen meddlesome and disposed to injure him; that to Steen's interference he attributed his failure to marry a certain woman previous to his engagement to his present wife; that he 'believed Steen let loose a stallion owned by defendant whereby one of his geldings was injured; that, in both a criminal and civil proceeding against defendant, Steen had been a witness for the prosecution; and that defendant had made threats that John Steen ought to and should feel the effect of defendant's guns.

True, some of these threats were remote, and there was also testimony of neighborly acts between the two, such as Steen going on defendant's bond when under arrest for another affray, lending money back and forth, and that defendant oiled Steen's windmill, and let him hire a work horse. But defendant admittd that there was no intimacy between the families, or friendly visits. Defendant's dwelling was about half a mile almost directly east of Steen's hog-house. The hog-house was evidently roomy and modern. It had four windows. It was divided up into pens, 8 feet by 10 feet in size, with a passage running north and south between them. The pen wherein Steen was found was directly in front of the south window on the west side. Opposite, on the east side, was a window.

A lighted lantern placed or hung in that pen gave a light plainly visible at defendant's home and yard. The evidence tended to prove that the one who shot Steen stood outside the west window of the hog-house upon a low platform, and held the pistol within a very few inches of the window-pane, for the bullet shattered the glass considerably. Steen must have been in a kneeling or sitting posture and within three or four feet of the muzzle of the weapon. This is indicated by the wound and the position in which he was found. The bullet taken from his body was fired from a Savage 32-caliber automatic pistol produced at the trial. The gun experts who testified, and who had experimented with this particular pistol, leave this fact so clearly established that defendant's counsel does not question the same. The markings upon the bullet found in the body correspond so accurately to the markings made by this weapon upon the bullets fired from it that the demonstration is complete. The same kind of bullet or cartridge may also be used in a 32-caliber Colt automatic pistol, but the rifling in the Colt is clearly distinguishable from the Savage and consequently a gun expert can readily detect from which weapon the bullet has been fired.

On May 8, when the murder was discovered, the county attorney, sheriff and others in the community began to search for clues which might detect the murderer. Tracks from a person running, and wearing number 10 rubber boots, led south from the hog-house over a few rods of recently cultivated ground to a strip of sod where was a row of willows. They could be traced no further. In the afternoon of that day defendant was seen driving a pulverizer, or disc-harrow, in a line from his barn, a few rods south of his house, towards the Steen farm and nearly opposite to the buildings thereon. The ground was not in fit condition to be worked, being wet and soggy. After one or two turns he unhitched and took the horses to the barn. About that time the sheriff with some other persons drove up to defendant and stated that they were collecting the guns from the neighbors to see whether any clue to the criminal might thereby be obtained. The testimony is that defendant at first appeared to be very nervous. He denied that he had or ever had anything but a shot-gun. The next day the sheriff again drove up to defendant's

farm. He was then working in the field and the sheriff asked and obtained permission to measure his rubber-boots, which measurement corresponded with the tracks before mentioned.

May 17, the sheriff, a private detective, a court reporter, and a driver came to defendant's home and arrested him. He resisted so vigorously that it required the combined strength of the four men to place handcuffs on him. He was placed in the jail at Fairmont. In the meantime his nephew, Fred Reim, had been induced to come from near Albert Lea to Fairmont to aid the authorities. Fred Reim was about 20 years of age. In August, 1912, he came from his home in Oklahoma to visit relatives in Minnesota. He assisted defendant a few days in stacking, went in company with him to the state fair, then helped a day or two in threshing, and made short stays later, one being in February, 1913. Reim knew that defendant had owned the Colt pistol but not the Savage. He testified that defendant always carried the Colt pistol wrapped in a red bandanna handkerchief, in his left hand trouser pocket; that he had expressed the wish that John Steen might feel its effect; and that he harbored ill-will towards Steen, believing himself wronged by him. At the instigation of the sheriff and officials, Reim visited the defendant and informed him that several hundred people were searching his premises for fire-arms, that they intended to procure a powerful dip needle by which steel could be detected even when hid four feet under the ground, and suggested that defendant better tell him, Reim, where the gun was hid so that he might carry it away and remove the incriminating evidence. After a long interview Reim was told that the pistol was hid near a certain fence post on the south line of the farm. That night the sheriff, county attorney and Reim drove out to the farm and found the Colt pistol at the spot indicated, greased and wrapped in a piece of old heavy underwear. The next evening Reim had another interview with defendant and then succeeded in ascertaining where the ammunition was hid. Guided by this information, a search was made the following day, and, along the line where defendant was seen discing on the afternoon of May 8, there was found, in a fence-post hole, a beer bottle and, in another post hole

near by, a glass fruit jar. In the bottle and jar were about 200 cartridges fitting a Savage or Colt 32-caliber automatic pistol.

In September following a young man, Thaxter Edman, son of the farmer occupying the farm immediately south of defendant's, was building a fence north to join the line fence. The post in the line fence, at the point where the new fence was to join, had rotted off near the ground and was supported only by the wires to which it was attached. The young man undertook to bore a new post hole at the side of the old. The auger struck a hard substance some eight inches down. This proved to be a 32-caliber Savage automatic pistol. It had been greased and wrapped in a red bandanna handkerchief and a piece of underwear of the same kind found wrapped around the Colt. Both pistols were found under the same line fence. The one near the first or second post east of a ditch and the other about the same distance west. The defendant gave as an excuse for having denied ownership of any pistol or revolver, and for having hid the Colt gun and the cartridges, that he was afraid their possession would cast suspicion upon him. He admitted having ordered the Colt from Sears, Roebuck & Co., a Chicago catalogue house, in 1911, and the proof was plenary that he had done so. But he denied having bought, owned or hid the Savage pistol.

As stated above the evidence amounts almost to a conclusive demonstration that the bullet which killed John Steen was fired from the Savage pistol found by Thaxter Edman. It was therefore very important to trace the purchase or ownership thereof to defendant. His father's name was C. Virgens and he lived near the village of Welcome, 8 or 9 miles from defendant's farm. The state claims to have established that defendant, on February 22, 1912, receipted for an express package in Exhibit 31, the receipt book of the express company kept in its office at Welcome. The package was of the same weight substantially as the package in which the Colt was expressed to him. The middle initial of defendant's name does not appear in either the address or signature in Exhibit 31. But, from the testimony of persons familiar with defendant's handwriting and from a comparison of his admitted signatures, the conclusion is clearly warranted that defendant receipted for the package at Wel-

come, although he strenuously denied that he ever received or re-receipted for any express package at that place. The defendant admitted that his father, C. Virgens, who was living in February,. 1912, but died prior to the homicide, could not have signed the express receipt. Neither of his two brothers, who resided near Welcome, nor any other relative was called to the witness stand. The state contends that the proof established the fact that the package receipted for contained this very Savage pistol purchased from and sent by the John M. Smythe Merchandise Co. of Chicago, a. catalogue house.

The errors assigned and urged as ground for reversal relate: (1) To rulings upon the admission of evidence tending to show that the Savage pistol, Exhibit 20, was in the express package receipted for by C. Virgens in February, 1912; (2) permitting witnesses to testify to the manner of speech and appearance of defendant; (3) allowing the county attorney to so cross-examine defendant that the jury learned that Mrs. Virgens could disclose facts bearing directly and almost conclusively upon defendant's guilt or innocence; (4) misconduct of the county attorney; and (5) errors. in the charge.

Fred Brotzman, for seven years in the employ of the John M. Smythe Merchandise Co. of Chicago, Illinois, was called by the state and testified that he was in charge of the sporting goods department of the company, and that it kept a record of every firm-arm sold. That he had this record for the month of February, 1912, in. court, being Exhibit 26. He fully explained the company's system of bookkeeping and identified Exhibits 24, 25 and 27 as parts thereof. Exhibit 24 was an index card, Exhibit 25 the cash book and Exhibit 27 the express receipt for goods shipped out. By numbers. from the system he could trace a firm-arm from one to the other of these records. Exhibit 31 was the American Express Company's delivery receipt book, signed by C. Virgens as above stated, and Exhibit 32 the monthly report of the express agent at Welcome accounting for the package to the Great Northern Express Co., the receiving express company at Chicago. The testimony of Brotzman disclosed that the John M. Smythe Merchandise Co. did a very

extensive business; that the mail orders accumulate so rapidly that it has been found advisable to destroy them at the expiration of three months after being filled; that the card indexes and the other records of the company are so kept as not to be accessible except to a certain person in charge thereof; that the witness was familiar with the system and could identify the exhibits mentioned as those of the company, but could not state by whom the entries were made except in the case of Exhibit 26 which was, to his knowledge, in the handwriting of the person authorized to make it. At the time the exhibits were being collected to bring to this state for use at the trial, there was written upon Exhibit 26 a number and a circle drawn around it. This number was no part of the exhibit and did not destroy its admissibility. It was placed there merely for convenient reference. The numerous clerks in this large establishment were outside of the court's jurisdiction. Neither the John M. Smythe Merchandise Co. nor the witness Brotzman had any interest, financial or otherwise, in the result of this prosecution. The records of that company, made and kept as a part of its system of doing business, were produced and indicated that a Savage 32-caliber automatic pistol of the same serial manufacturer's number as Exhibit 20, found near the fence post by Thaxter Edman in September, 1913, was sold, packed and delivered to the Great Northern Express Co. on February 17, 1912, at Chicago for shipment to C. Virgens at Welcome, Minnesota. The manner of keeping these exhibits, the necessity for accuracy, the exceeding improbability that the entries thereon were made by any one except by the duly authorized person, cognizant at the time of the correctness of the entry or of the data from which it was made, assure veracity and point to the exhibits as the most reliable testimony concerning the whereabouts of Exhibit 20. Indeed, had the clerk who packed and delivered the pistol to the express company been placed on the witness stand, it is wholly improbable that he could have remembered a solitary thing about the transaction, and could only have testified that the entry on some records made at the time was in his handwriting. So that, after all, the records, properly identified, were the best evidence obtainable of the transaction. Whether the books or records offered were sufficiently identi-

fied as the books and records made and kept in the usual course of the business and thus a proper foundation for their introduction laid, was for the trial court to determine. We see no reversible error or abuse of discretion in his rulings. The rule he applied was sanctioned in Swedish American Nat. Bank of Minneapolis v. Chicago, B. & Q. Ry. Co. 96 Minn. 436, 105 N. W. 69; Strand v. Great Northern Ry. Co. 101 Minn. 85, 111 N. W. 958; Wigmore, Evidence, p. 1895; Fielder v. Collier, 13 Ga. 496. We do not find any merit in the contention that the witness Brotzman was erroneously permitted to state conclusions. He was familiar with his employer's business, the bookkeeping system, and the signs or numbers by which one record connected up with another in such system. In the light of this knowledge he had information and opinions not possible for the jury to obtain by the mere inspection of the books.

Permitting witnesses to testify as to the manner of speech and appearance of defendant under circumstances where an accusing conscience would be likely to betray evidences of guilt was not error. 1 Dunnell, Minn. Digest, § 3315.

Defendant took the witness stand, denied guilt, and asserted that on the night of the homicide he was at home. It was but legitimate cross-examination to bring out in whose company he spent the night. He maintained that he was continuously in his wife's presence. By the cross-examination of the state's witness, Fred Reim, and by defendant's direct examination, his counsel sought to show that criminal intimacy existed between Mrs. Virgens and Reim, that Reim might be the murderer and that it would serve the dark desires of the two to fasten the crime upon defendant. This was an attempt to justify the nonproduction of the wife as a witness, and to leave the impression with the jury that he was the victim of an atrocious plot. In this situation, the state by failing to request his consent to use Mrs. Virgens as a witness would admit defendant's aspersions. We have lately held in State v. Roby, supra, page 187, 150 N. W. 793, that it was not reversible error to permit the state to request the defendant in a criminal prosecution to consent to his wife testifying. The case at bar is much stronger. Indeed, the course defendant and his counsel pursued made it permissible, if not almost

imperative cross-examination, to ask defendant whether he would consent to the state placing his wife upon the witness stand.

Defendant accuses the prosecuting attorney of misconduct in several respects. We have already considered the complaint in respect to the cross-examination of the defendant. In opening the case to the jury the county attorney stated that the state would prove that defendant told Fred Reim that his wife had told the county attorney everything she knew. Fred Reim so testified, without objection, and was not even contradicted by defendant. In the closing address the county attorney said: "The defendant tells you that he was home on the night of May 7. Now, gentlemen, there are only two persons who know whether he was home or not. He was living there alone with his wife. He has gone on the stand and given his testimony. We would like to have had the testimony of the other person who was there and knows whether he was home or not." We have already considered the cross-examination of the defendant, revealing the whereabouts of his wife and his claim that he was with her when the homicide occurred, proper; that being so, the remarks quoted are not outside the record. In addition to the authorities cited in State v. Roby, supra, sustaining the course pursued by the county attorney we may give, Wharton, Criminal Evidence (10th ed.), § 435a, where it said "where the wife of accused is by statute made a competent witness, comment may be made on his failure to call her." The wife is not rendered incompetent by reason of our statute (section 8375, G. S. 1913). In re Holt's Will, 56 Minn. 33, 57 N. W. 219, 22 L.R.A. 481, 45 Am. St. 434. Also State v. Millmeier, 102 Iowa, 692, 72 N. W. 275; Commonwealth v. Weber, 167 Pa. St. 153, 31 Atl. 481.

The reference by the prosecutor to the fact that, because of supposed local prejudice, defendant had obtained a change of place of trial from Martin to Faribault county, though out of place perhaps, should not reverse the judgment in view of defendant's examination of the jurors on that score and the court's admonition to the jury not to let that circumstance in any manner weigh against defendant.

The trial court gave a clear and comprehensive charge. The arguments of counsel evidently occasioned and justified this instruc-

tion: "Now, gentlemen, considerable has been said upon the trial of this case with relation to defendant's property and where it might go in case he should be convicted, but, gentlemen, those matters have no concern with you; you are not concerned in the least where the property might go in case he should be convicted in this case, except insofar as the disposition of that property might affect the credibility of any of the witnesses testifying." No vice is perceived in the instruction.

We have endeavored to examine the record, including exhibits, with the great care which the gravity of the case demands. The evidence is wholly circumstantial, but we entertain no misgivings that the jury went wrong. No prejudicial error is found in the assignments not herein specially mentioned. Our conclusion is that the conviction must stand.

Judgment affirmed.