## STATE v. JOHN ERWIN BECK, JR.

183 N. W. (2d) 781.

February 5, 1971—No. 42496.

*Robins, Meshbesher, Singer & Spence, Ronald I. Meshbesher,* and *Morley Friedman,* for appellant.

*Warren Spannaus,* Attorney General, *James M. Kelley,* Assistant Attorney General, *William B. Randall,* County Attorney, and *Steven C. DeCoster,* Assistant County Attorney, for respondent.

PETERSON, JUSTICE.

Defendant, who was convicted, after a jury trial, of aggravated robbery (Minn. St. 609.245 and 609.05), appeals from a judgment of conviction and from an order denying a motion for judgment notwithstanding the verdict or for a new trial.

■ On March 11, 1970, a jury found defendant guilty of driving a get-away car used in connection with a robbery of the Venetian Inn, 2814 Rice Street, in the village of Little Canada. The evidence adduced at trial, viewed most favorably to sustain the jury's verdict, linked defendant with the crime; but, as will be observed, the evidence was not overwhelming.

At 10:15 a. m. on Monday, September 22, 1969, a lone armed robber (not claimed to be defendant) entered the office of the Venetian Inn at a time when two of the owners, John and Joseph Vitale, were counting weekend cash receipts. The gunman ordered the two Vitales to place the cash in a briefcase and to keep their heads down, and then ordered the men into a back room.

A few minutes later, the Vitales looked through a window and noticed the tail end of a late-model black and white automobile, with two men in it, pulling out of the Venetian Inn parking lot. They had not seen the robber get into that car, but, thinking that he had, they left their office, each in his own separate automobile, and followed the black and white vehicle south on Rice Street. As many as six cars had been parked in the Venetian Inn parking lot at the time of the robbery, the restaurant and bar had been open since 9 a. m., and it was possible that customers may have been leaving the parking lot in the black and white car.

John Vitale was the first in pursuit of this vehicle, which may have been the get-away vehicle. He left the Venetian Inn in his car about 1½ to 2 minutes after he saw the black and white car leaving. John thought that the car he was following was the same car he had seen leaving the Venetian Inn parking lot. Inability to get close to the car and poor visibility caused by misty

weather prevented John from ascertaining the number of people in the car or the car's license number. The black and white car stopped near the North Heights School. John at this time was approximately 4 blocks behind the black and white car. A man alighted from the driver's side of the black and white car, walked across the school yard to a brown or tan car in the school parking lot, opened the trunk of the second car, and placed a briefcase in it.

Joe Vitale, who had been following some distance behind John Vitale's car, testified that he observed the black and white car as it appeared to accelerate from a stopped position. From a distance of 40 to 50 feet, he saw an adult man running from the embankment along Rice Street to the school building. He did not know whether the man had been in the black and white car, nor could he tell whether the man was carrying anything. Joe briefly followed the black and white car, but instead decided to stop at a service station to telephone the Roseville police to inform them of the robbery.

John Vitale started to pursue the black and white car again when he observed it proceed in a southerly direction on Rice Street, but then he noticed a car in motion in the school parking lot. He continued going south for about 1 block, where he made a U-turn. For a few moments he lost sight of the car. Then he saw a new-model tan car, which he described as a Plymouth or Ford or Chevrolet, traveling north on Rice Street. He thought it was the same car in which he had observed the man place a briefcase, but he did not actually see the car leave the school parking lot. There were many cars traveling north on Rice Street at that time. John followed this car for a mile, until the car entered onto Highway No. 35E, traveling west. He never got closer than 4 to 7 car lengths to the tan car. He never observed the face of the man driving the car. He was unable to say whether the driver was the man he had seen walk across the school yard to the tan car that was parked there.

John Vitale was able to observe the license number of the tan

vehicle and he reported this number to the Ramsey County sheriff's patrol station located near Rice Street and Highway No. 35E. He did not write down the license number and at trial did not remember what license number he had given to the sheriff's office except that the first three symbols were "3WW." No one else testified as to the exact license number that was reported by John to the sheriff's office. John admitted that because of poor visibility he could have been mistaken concerning the license number he gave to the authorities.

Highway Patrolman Warren Ritala stopped defendant 15 minutes after the robbery at Mississippi Boulevard in Fridley, 8 miles from the junction of Rice Street and Highway No. 35E where John Vitale had stopped trailing a tan car. Defendant was driving a brown, 1969 4-door Chevrolet bearing license number "3WW937." Although Officer Ritala had been provided by radio with a description of the vehicle, its license number, and the owner's name, the evidence is not conclusive that the license number of defendant's car was the same as that reported by John Vitale.

Defendant, when stopped, presented his driver's license upon request. Defendant's vehicle was not traveling at an excessive speed and defendant did not appear to the arresting officer to be in a hurry. A search of defendant and the car produced no weapon and, notably, no briefcase or money (although the sequence of time and distance may not have precluded a jettison of such items en route). Defendant was wearing a red plaid shirt, trousers, and work or hunting boots.

Donald Wilske, a janitor employed at North Heights School, testified that from the school yard he saw a black and white car come south on Rice Street and stop; the driver got out, walked to a greenish-tan car parked in the parking lot, put a briefcase in the trunk, and drove off north on Rice, while the black and white car went south. Wilske described the man he had seen as approximately 5 feet 10 inches in height and of a stocky build, weighing 180 or 190 pounds, having crew-cut hair, and wearing

a green plaid mackinaw jacket or shirt. These observations were made from a distance of 250 feet.

Defendant is 5 feet 8 inches, weighs 180 pounds, and has light brown hair worn in a crew-cut fashion. Wilske was asked on direct examination: "Do you see anyone in the courtroom today that appears to resemble the person you saw on that date in the parking lot?" He answered, "No." Defendant was sitting at the counsel table when the question was asked.

John Vitale first told the police that the vehicle he followed north on Rice Street was tan colored. After he was shown defendant's car, he changed his description to brown. Wilske described the car he saw as greenish-tan. A detective who photographed defendant's car said it was green.

No lineup was conducted, but John Vitale was shown five or six photographs about 1½ hours after the robbery. He selected defendant's photograph, saying that the name on the photograph "rang a bell" and that the face looked "familiar." He told police that defendant could have been a customer at the Venetian Inn at one time or another, but did not answer the question, "* * * did the photograph that you observed appear to be the person that you saw get into that car?"

The evidence, in summary, established a chain of evidence with these links: (1) The late-model black and white car which the Vitales saw leaving their Venetian Inn lot may have been the getaway car; (2) the black and white car which they followed may have been the car which they saw leaving their lot; (3) the tan car which John Vitale followed may have been the same tan car into which the man who emerged from the black and white car placed a briefcase; (4) defendant's car may have been the tan car which John Vitale followed. Notwithstanding reservations as to the verdict, we would not reverse the judgment were the trial otherwise free from error.

■ We conclude, however, that the jury's verdict, in the particular circumstances of this case, may have been unduly influenced by impermissible testimony of the arresting officer,

so that in the interest of justice a new trial should be ordered.

Officer Ritala was permitted to testify, over clearly stated objection, that he gave defendant a "Miranda warning," which, the witness testified, included advising defendant that he had a right to remain silent and that anything he said might be used against him.

The officer's testimony was wholly gratuitous, serving no probative purpose whatever. It was not intended as a foundation for the admission of a voluntary confession by defendant, for defendant had made no statement of any kind. The state asserts that it was intended only to apprise the jury that defendant "was treated fairly." The potential prejudicial effect, whatever the intent, was to encourage the jury to speculate that defendant had remained silent at the time of his arrest and that he did so because he was guilty; and, additionally, to encourage an adverse inference of guilt from defendant's failure to testify at the trial.

Needless use of such testimony offends a principle of justice declared in Miranda v. Arizona, 384 U. S. 436, 468, n. 37, 86 S. Ct. 1602, 1625, 16 L. ed. (2d) 694, 720:

"* * * [I]t is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation."

Numerous courts have held, for such reason, that it is error to permit the prosecution to introduce evidence that defendant remained silent after being informed by police of his right to remain silent. It has been held prejudicial error by some, e. g., People v. Lampson, 129 Ill. App. (2d) 72, 262 N. E. (2d) 601; State v. Brown, 185 Neb. 389, 176 N. W. (2d) 16; but not prejudicial error by others, e. g., People v. Savala, 10 Cal. App. (3d) 958, 89 Cal. Rptr. 475; State v. Boykin, 285 Minn. 276, 172 N. W. (2d) 754.

The arresting officer did not, it is true, testify that defendant

remained silent after receiving the Miranda warning, but the jury arguably could have drawn that inference. The jury may have related it, moreover, to defendant's subsequent failure to testify in his own behalf at the trial, with an assumption that he chose not to take the stand because he could not truthfully swear to his innocence. See, Griffin v. California, 380 U. S. 609, 85 S. Ct. 1229, 14 L. ed. (2d) 106; Minn. St. 611.11. But cf. State v. Russell, 282 Minn. 223, 64 N. W. (2d) 65, certiorari denied, 396 U. S. 850, 90 S. Ct. 109, 24 L. ed. (2d) 100.

The arresting officer's testimony, we again underscore, was pointless in this trial. As Mr. Justice Stewart, speaking in a related context, said in United States v. Jackson, 390 U. S. 570, 582, 88 S. Ct. 1209, 1216, 20 L. ed. (2d) 138, 147:

"* * * The question is not whether the chilling effect [upon the exercise of basic constitutional rights] is 'incidental' rather than intentional; the question is whether that effect is unnecessary and therefore excessive."

We cannot, in the circumstances of this case, conclude that the error was harmless beyond a reasonable doubt. Chapman v. California, 386 U. S. 18, 87 S. Ct. 824, 17 L. ed. (2d) 705.

Reversed and remanded for a new trial.