STATE of Minnesota, Respondent,

v.

**Larry Lee JOBE, Appellant.**

**No. C1–91–469.**

Supreme Court of Minnesota.

June 26, 1992.

Peter A. Cahill, Colich & Cahill, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin County Atty., Gary S. McGlennen, Stephen L. Redding, Asst. County Attys., Minneapolis, for respondent.

GARDEBRING, Justice.

Larry Lee Jobe was convicted of two counts of murder in the first degree in the stabbing deaths of Debora Ritacco ("Ritacco") and her two-and-one-half year old daughter Andria Ritacco. Appellant was sentenced to two consecutive life terms for the murders. Appealing the judgment of conviction, appellant challenges the admission into evidence of portions of his statements to police, asserting a violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He also challenges the admission of autopsy photos of Debora and Andria Ritacco, descriptions of his reaction to being told of the crimes, and two references to his being in jail. Appellant asserts that the prosecution attempted on two occasions to shift the burden of proof to the defendant. Appellant also challenges the admission of deoxyribonucleic acid ("DNA") evidence, asserting that the reliability requirements of *State v. Schwartz*, 447 N.W.2d 422 (Minn.1989) were not satisfied. Finally, appellant challenges his sentence of two consecutive life terms, arguing that he was entitled to a sentencing hearing and that the sentence was a departure from the Minnesota Sentencing Guidelines.

Appellant and Ritacco, who worked for the same company, dated for approximately six months in the spring and summer of 1988. Ritacco broke off the relationship in August; after the breakup, appellant continued to try to revive the relationship.

On Tuesday morning, November 29, appellant tried to call Ritacco at her desk. One of Ritacco's co-workers answered the phone, spoke with him about his relationship with Ritacco, and untruthfully told him that Ritacco was seeing someone else. Appellant called another co-worker to talk about Ritacco, told her that Ritacco was seeing someone else, and "sounded very upset." The co-worker suggested appellant call Ritacco. Immediately after the co-worker hung up, Ritacco's phone rang, and the co-worker answered it because Ritacco was not at her desk. It was appellant.

At lunchtime, appellant purchased a hand gun at a gun shop close to his home. He paid for the gun with a credit card, but did not receive it because of the seven day cooling-off period. At the time of the purchase, the gun store clerk reported that appellant seemed upset.

After lunch, appellant talked to yet another co-worker about his relationship with Ritacco. They talked for approximately an hour, during which time appellant asked if he should go to Ritacco's house if she would not see him at work. According to the co-worker, appellant confided that he had thoughts of suicide and that fights with Ritacco "brought out the worst in him."

Later that afternoon, appellant at last reached Ritacco on the telephone. They talked for about twenty minutes, and appellant persuaded Ritacco to have lunch with him the next Monday. After the call, Ritacco told two co-workers that she was going to call appellant that night and cancel the lunch date.

The next morning, one of Ritacco's co-workers was worried when Ritacco did not arrive for work. She called Ritacco's apartment. Receiving no answer, she then called the home of Ritacco's ex-in-laws. Debora Ritacco's ex-brother-in-law answered the phone. He also tried calling Ritacco, and when he could not reach her he went to Ritacco's apartment. When he got to the apartment he found the door locked. He unlocked the door with a key Ritacco had given his mother. When he entered he saw Ritacco's body in the living room, slumped over her bed. She had been

stabbed many times. He went into Andria's bedroom and found that she too was dead, also the victim of many stab wounds. He ran to a neighbor's and called the police.

The Bloomington Police arrived at the apartment complex at approximately 1:00 p.m. and began investigating the double homicide. In addition to the blood on and around the two victims, the police found blood in the bathroom sink, on the light switches in the bathroom and Andria's room, on a bathroom rug, on the sliding glass door to the balcony, and on the balcony itself. A disturbance in the snow under the balcony suggested that someone had jumped off and walked or ran away. The police followed the trail of blood to the parking lot, where it ended. Because of the great quantities of blood apparently left by the killer, the police believed that the killer had probably injured him or herself during the attack. The police did not find any evidence of a forced entry to the apartment, or of any missing property.

As the police were gathering evidence at the apartment they learned that Ritacco had recently been dating appellant. The police called appellant and Ritacco's employer and learned that appellant had not come to work that day, reporting by telephone that he had cut his hand. After calling area hospitals, the police learned that appellant had called an ambulance during the night and been treated for a cut hand at North Memorial Hospital. The police immediately began surveillance of appellant's apartment building and began preparing a search warrant for appellant's apartment and car.

Soon after the police arrived at the apartment building, they saw three people enter the building and the lights went on in appellant's apartment. A short while later, an older man, later identified as appellant's father, carried two garbage sacks to the dumpster. The police became concerned that appellant might be destroying evidence and decided to enter the apartment and "freeze" the situation until the search warrant arrived. They entered the apartment, quickly searched the apartment for other people, and sat down with the Jobes to wait for the warrant. As the police waited they heard appellant's mother ask him several times about where his jacket was.

Before the search warrant arrived, appellant talked with the police. Appellant's hand was extensively bandaged, and he told police that he had been injured in downtown Minneapolis about 1:00 a.m. the night before, when two men approached him, asked him to buy drugs, and slashed at him with a knife when he refused. After the search warrant arrived the police told appellant he was under arrest for the murder of Ritacco. One police officer testified that appellant cried briefly at this news. Another officer testified that appellant had no reaction.

The police read appellant a *Miranda* warning and asked him if he was willing to cooperate with them. He said he was willing to talk. The police asked him whether he had any knives and he told them he had two and took them to a dresser drawer. There was only one knife in the drawer. Appellant said the other knife must have been stolen while he was at the hospital the night before. The police did not find any evidence that the apartment had been burglarized or ransacked.

The police asked appellant to give them the clothes he had been wearing the night before and he gave them a sweatshirt with blood on the cuff, a pair of sweatpants, and a pair of tennis shoes. The police also found a pair of bloody undershorts which appellant admitted he was wearing the night before. With the exception of the sweatshirt and the undershorts, none of the clothes had any blood on them, which seemed unusual to the police, given the amount of blood on the shorts. When the police asked if appellant was wearing a coat he took them to the front closet and gave them a two toned ski jacket. When the police looked at the jacket and did not see any blood they questioned appellant further. Appellant admitted that he had lied, when he said he had not worn any jacket the night before but he feared the police would not believe him. It had been

about 27 degrees out the night before. In response to a police question appellant stated again that his hand was injured the night before in downtown Minneapolis.

The police searched the bags which appellant's father had taken to the dumpster and discovered a bloody blue rug and a bag from a cutlery store. The bag contained an empty hunting knife box, apparently from a knife which appellant had purchased the night before. Both the sales clerk and a friend of hers who had been at the store the night before identified appellant from a picture as the man who had purchased the knife. Appellant had started to pay for the knife with a credit card, but changed his mind and paid cash.

A search of appellant's car revealed blood on the steering wheel, seat, seatbelt, and radio dial. There was also a trail of blood from his car to his apartment door. A picture of appellant's car was posted at the apartment complex where Ritacco had lived and a neighbor of hers and the neighbor's sister recalled seeing a car similar to it parked in the parking lot the night of the murders. Another neighbor reported hearing angry voices coming from the direction of Ritacco's apartment that night.

At the police station the police read appellant a *Miranda* warning again. When the police asked him to tell them what he had done the night before, he said he did not want to talk about it, but suggested they talk about "lighter" subjects. At trial, the police testified that when they told appellant that Andria Ritacco also was dead he had no response.

At trial, the prosecution introduced evidence that appellant had told conflicting stories about how his hand had been injured. When appellant called the ambulance, he told the dispatch operator that he had been injured in a fight outside a bar. When the ambulance driver arrived, appellant told him that he was injured by some drug dealers downtown. The prosecution also introduced the photograph that the police had shown the cutlery sales clerk and her friend, which was a booking-style photograph (without any numbers). A doctor who treated appellant's hand at the

hospital testified that appellant's wound was consistent with a wound from a double-edged knife, such as the knife appellant purchased the evening of the murders. The doctor also testified that it was difficult to treat appellant while he was in jail.

The physician who performed the autopsy testified that the victims died from loss of blood due to their wounds. Debora Ritacco had 106 wounds and Andria Ritacco had 56 wounds. She also testified that the wounds were the type that would be made with a double-edged knife like that purchased by appellant the evening of the murder. The state introduced twenty-six autopsy photographs of the two victims, along with other pictures of the crime scene, including three which show the victims' bodies as they were discovered.

The state also introduced extensive blood evidence. According to standard blood-typing and electrophoresis analysis, some of the blood found in appellant's car and on appellant's sweatshirt could not have come from appellant, but could have come from either of the victims. There also was blood consistent with appellant's blood type in the car and on the sweatshirt. Some of the blood found in the Ritacco apartment could have come from appellant, but could not have come from either of the victims. Blood found on the deck and balcony railing, the parking lot, and the sidewalk also was consistent with appellant's blood type, but could not have come from either of the victims. The blood on the bathroom switchplate was consistent with both appellant's and the victims' types.

The state also presented evidence of DNA testing on several blood samples taken from the Ritacco apartment. The samples were sent to the FBI and tested by Dr. Dwight Adams. Prior to the evidence's admission at trial, the trial court held an extensive *Frye* hearing to determine whether the DNA Restriction Fragment Length Polymorphism (RFLP) testing procedures used by the FBI were reliable and in compliance with recommended standards and controls. The hearing took place July 16–19 and 24–27, 1990 and August 10, 16, and 22–24, 1990. Nine expert witnesses

testified, six for the state and three for the defense. There was evidence presented at the hearing that the DNA RFLP testing procedures utilized by the FBI are recognized as accurate and reliable by the scientific community. There was also evidence challenging the procedures themselves and the statistical databases the FBI uses to identify a "match" between the several samples.

At the hearing and at trial, Dr. Adams testified that two of the four tests run on the samples indicated that appellant could not be excluded as the donor of blood on a bath rug at the Ritacco residence, and as the donor of two samples from an exterior door. Both victims were excluded. Adams believed that the other two tests were inconclusive, feeling that the results were not clear enough to call. Another DNA expert, Dr. Thomas Caskey, found that all four samples matched appellant's known DNA, calling the match a "very, very, very significant match." Both Dr. Adams and Dr. Caskey testified that appellant could not be excluded as a donor based on the DNA analysis.

Dr. Adams testified that the FBI laboratory complied with the Technical Working Group for DNA Analysis Methods ("TWGDAM") guidelines for DNA RFLP testing procedures, and that the recommended procedures were followed when he did his DNA analysis.

The state's blood expert testified that there would be sufficient blood remaining for defense testing after the prosecution completed its tests. The prosecution also asked Dr. Randall Libby, the defense expert who was critical of the FBI's DNA RFLP testing procedures, whether Dr. Libby could do such testing in his own lab if samples had been provided. Dr. Libby responded that he could not, he did not have the equipment required.

Appellant challenges two aspects of the testimony regarding the *Miranda* warning given at the police station and his subsequent statements. First, he argues that it was error to allow the police to testify that he received a *Miranda* warning. Appellant also asserts that his refusal to answer one question during the course of the interrogation was actually an invocation of his right to remain silent, and thus should not have been admitted.

■ The fifth amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The fifth amendment applies to the states through the fourteenth amendment. *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964). The Minnesota Constitution has an identical provision. Minn. Const. art. I, § 7. In accordance with this constitutional protection, the prosecution cannot use an admission of the accused unless the state can show the accused intelligently waived the right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). The prosecution also has the burden of proving that the statement was freely and voluntarily made. *See Haynes v. Washington*, 373 U.S. 503, 512–13, 83 S.Ct. 1336, 1342–43, 10 L.Ed.2d 513 (1963).

■ Appellant first asserts that allowing police detectives to testify that they read appellant a *Miranda* warning is reversible error. Once an individual has received a *Miranda* warning and chosen to remain silent, the prosecution may not use that silence at trial. *Miranda*, 384 U.S. at 468, n. 37, 86 S.Ct. at 1624, n. 37. To prevent a jury from improperly assuming that an accused exercised the right to remain silent, this court does not allow the prosecution to reveal only the fact that the accused received a *Miranda* warning. *See State v. Beck*, 289 Minn. 287, 292, 183 N.W.2d 781, 783–84 (1971).

■ However, testimony that the accused received a *Miranda* warning is admissible as foundation for a later statement by the accused to show that the statement was made voluntarily. *State v. Carl*, 310 Minn. 365, 371, 246 N.W.2d 192, 196–97 (1976); *State v. Combs*, 292 Minn. 317, 322, 195 N.W.2d 176, 179 (1972). Here, the prosecution asserted it offered the police testimony on appellant's receipt of a *Mi-*

*randa* warning as foundation for the admission of appellant's subsequent statement. The police did in fact testify to appellant's subsequent statements; under these circumstances, the admission of the testimony about the *Miranda* warning was not error.[1]

■ Appellant also asserts that his refusal to answer a particular question was an invocation of the right to remain silent, and that the court erred in admitting that invocation. At the police station, after giving appellant the *Miranda* warning, the police again asked appellant what he had been doing the night before. Although he had previously described to police the claimed assault of the night before, appellant answered that he did not want to talk about that, but that he would talk about other, "lighter" subjects. Appellant asserts that, by refusing to answer that question, he was invoking his right to remain silent. The prosecution cannot use the fact that an accused was silent in the face of police questions. *Miranda*, 384 U.S. at 468, n. 37, 86 S.Ct. at 1624, n. 37. During custodial police questioning, an accused has the right to stop the questioning at any time. *Miranda*, 384 U.S. at 445, 86 S.Ct. at 1612; *State v. Roberts*, 296 Minn. 347, 352, 208 N.W.2d 744, 747 (1973).

■ In *Roberts* we held that evidence of the invocation of the right to *counsel* does not become admissible because the accused answered questions before the invocation, but this reasoning applies equally well to the right of *silence*. The question remains, however, whether the principle is apropos to these facts. Appellant argues his situation is like that in *Roberts*, where testimony was admitted that the defendant was answering questions during a police interrogation and then answered one question by saying he wanted to talk to an attorney. The questioning stopped, but the entire conversation was admitted into evidence at

trial. *Roberts*, 296 Minn. at 349–50, 208 N.W.2d at 745. This court determined that it was error to allow its admission.

However, in *Roberts* there was no issue as to whether defendant had actually invoked his constitutional right. Here, appellant did not respond to the question by unequivocally asserting the right to remain silent.[2] Rather, he answered that he did not want to talk about the subject of his actions the previous evening but was willing to talk about "lighter" subjects, and went on to talk about other subjects with the police.

While this court has never explicitly addressed the effect of an equivocal request to remain silent, as we have with regard to the right to counsel, *State v. Robinson*, 427 N.W.2d 217 (1988), some guidance may be found in *State v. Nelson*, 257 N.W.2d 356 (Minn.1977). In *Nelson*, the police advised the defendant of his *Miranda* rights and asked him if he would answer some questions. He responded, "It all depends." The defendant went on to answer some questions, and admitted killing the victim. *Id.* at 359. The defendant claimed error in the receipt of the evidence, but this court noted that the defendant's reply "indicates he reserved the option to answer only such questions as he wished." Under these circumstances we concluded that it was not error to admit the confession. *Id.*

The Eighth Circuit addressed a similar question in *United States v. Joyner*, 539 F.2d 1162 (8th Cir.1976), *cert. denied*, 429 U.S. 983, 97 S.Ct. 499, 50 L.Ed.2d 593 (1976). In *Joyner*, the defendant was in default on a Small Business Administration loan, which he had used to buy a truck and trailer. When questioned by FBI agents after receiving a *Miranda* warning, he admitted he had the truck, but refused to reveal its location. He later claimed that his refusal to tell the agents the location of the truck was an invocation of his right to

---

1. Appellant does not challenge the admission of those statements.

2. The issue of a request for counsel was litigated extensively below in pretrial proceedings. While the state reargues this issue in its brief, appellant's brief raises no such claim. Further-

more, at oral argument counsel for appellant specifically indicated that the *Miranda* issue raised on appeal went only to the right to remain silent. Therefore we do not reach the right to counsel issue.

remain silent. 539 F.2d at 1165–66. The court held that his "statement that he would not reveal the exact location of the truck was a direct answer freely given, not an ambiguous assertion of his right to remain silent." *Id.* at 1165.

Appellant's claim here is also similar to that of the defendant in *People v. Rickard,* 99 Ill.App.3d 914, 55 Ill.Dec. 144, 425 N.E.2d 1317 (1981). In *Rickard,* the defendant answered two questions during the course of a police interrogation by saying, "I won't tell you." 99 Ill.App.3d at 917–18, 55 Ill.Dec. at 146, 425 N.E.2d at 1319. The defendant later asserted that those two answers amounted to a desire to remain silent. The court held that the defendant was refusing to answer two questions, not expressing a desire to remain silent. The court noted that the defendant never expressed an unwillingness to talk, and there was no evidence of duress or coercion. *Id.*

Prior to the questioning at the police station, appellant had never been unwilling to talk to the police. Before the first *Miranda* warning at the apartment, he told the police his version of how he cut his hand, and repeated the story in response to a question after he first received the *Miranda* warning. He had also told conflicting accounts of his injury to the ambulance dispatch operator and ambulance driver. After the *Miranda* warning at the Bloomington Police Station, he made the statement that he did not want to discuss the night of the murders but would discuss "lighter" subjects. He went on to tell the police about his childhood, college days, and former relationships. Particularly in light of appellant's prior willingness to talk with the police about the events of the night before, we do not find that appellant's refusal to answer the question again, while still willing to talk about other subjects, was an assertion of his right to remain silent, and therefore, no issue of its admissibility arises.

■ Furthermore, even if the refusal to answer only one question could be construed as an assertion of the right to remain silent, admission of that assertion, on these facts, would be harmless in light of the overwhelming evidence against appellant. *State v. Warndahl,* 436 N.W.2d 770, 776 (1989); *State v. Forcier,* 420 N.W.2d 884, 886–87 (1988); *State v. Robinson,* 427 N.W.2d 217, 224 (1988).

■ Appellant next asserts that the introduction of death scene and autopsy photographs was error because they had more prejudicial effect than probative value. The admission of photographs at trial is in the discretion of the trial court. *State v. Daniels,* 361 N.W.2d 819, 828 (Minn. 1985); *State v. Hines,* 148 Minn. 393, 397, 182 N.W. 450, 451 (1921). The standard for the admissibility of photographs was set by this court in *State v. DeZeler,* 230 Minn. 39, 41 N.W.2d 313 (1950), where we said:

> Photographs are admissible as competent evidence where they *accurately* portray anything for which it is competent for a witness to describe in words, or where they are helpful as an aid to a verbal description * * * provided they are relevant to some material issue; and they are not rendered inadmissible merely because they vividly bring to jurors the details of a shocking crime or incidentally tend to arouse passion or prejudice.

*DeZeler,* 230 Minn. at 46–47, 41 N.W.2d at 319 (emphasis in original). At trial, the state introduced thirty-four photos of the victims' apartment, three of which showed the victims, and twenty-six autopsy photos of the victims, fourteen of Debora Ritacco and twelve of Andria Ritacco.

■ Appellant does not challenge the accuracy of the photos; rather, he asserts that they are not relevant to what he sees as the only material issue at trial, the identity of the killer. When the perpetrator of an injury is unknown, photographs that show the extent and severity of the injuries are relevant to indicate the injuries' cause and source. *State v. Durfee,* 322 N.W.2d 778 (Minn.1982). In *Durfee,* a baby received a severe head injury while in the defendant's care. The defendant asserted that the baby had fallen head first out of her crib. The pictures demonstrated damage to the head that seemed more severe than one would expect from a mere fall. *Durfee,* 322 N.W.2d at 782, 785–86. Here,

the death scene photos tell a story of an assailant who was injured while attacking the victims, leaving a trail of blood through the apartment and out to the parking lot. The autopsy photos show defensive wounds on Ritacco, indicating she probably resisted the attack. The number of wounds on both bodies (a total of 162 wounds) suggests an attack motivated by uncontrolled anger. While not in themselves presenting conclusive evidence linking appellant to the crime, the photographs certainly have probative value.

Additionally, the number and severity of the wounds are evidence of premeditation and intent. Photographs which clearly illustrate wounds are relevant when the state is trying to establish premeditation. *State v. Alton*, 432 N.W.2d 754, 757–58 (Minn.1988). While the defense was not challenging the elements of premeditation and intent, the state still had the burden of proving them in order to convict for murder in the first degree. *See* Minn.Stat. § 609.185 (1990).

These pictures are horrifying. While the fact that they are horrifying does not make them inadmissible, we want to remind courts and prosecutors of our increasing discomfort with the large numbers of autopsy and crime scene photos being admitted. Given the possible prejudicial effect on the jury of viewing these gruesome scenes, we ask that courts exercise their discretion to ensure that the jury is adequately informed without being overwhelmed.

Appellant next asserts that the admission of police testimony on Jobe's reaction to hearing the news of the deaths of Debora and Andria Ritacco is error. Appellant bases his argument for exclusion of this testimony on *State v. Fenney*, 448 N.W.2d 54 (Minn.1989). In *Fenney*, the testimony of a polygraph operator as to the defendant's reaction to certain questions was admitted at trial. The fact that the witness was a polygraph operator was presented as foundation evidence for his opinion that the defendant's reaction was "very unusual" and that defendant did not respond with "emphatic denial." *Fenney,*

448 N.W.2d at 61. This court held that both the testimony that the witness was a polygraph operator and the demeanor evidence were wrongly admitted. *Id.* at 62.

This case is easily distinguished from *Fenney*. What troubled us in *Fenney* was not the report of the defendant's reaction alone, but the fact that the witness giving the report had been identified as a polygraph operator, which may have inappropriately bolstered the value of his testimony. *See id.* The witnesses here offered no opinion of appellant's reaction, nor were they identified in any way as being experts on emotional response. Thus, the same risk is not present.

By prohibiting the demeanor evidence offered by a polygraph operator in *Fenney*, we did not intend to overrule our previous policy of allowing the admission of relevant testimony regarding a defendant's actions, manner of speech, and appearance both before, during, and after a charged crime was committed. *See State v. Bias*, 419 N.W.2d 480, 485 (Minn.1988) (evidence of defendant's flight after crime suggests consciousness of guilt); *State v. Salazar*, 289 N.W.2d 753, 755 (Minn.1980) (where defendant asserted self-defense, witness allowed to testify as to the actions of defendant during the fight); *State v. Gruber*, 264 N.W.2d 812, 819–20 (Minn. 1978) (where defendant's friend committed murder, defendant was with friend before the crime, and friend jumped in defendant's car to escape after the crime); *State v. Virgens*, 128 Minn. 422, 425–26, 151 N.W. 190, 192 (1915) (witness testified that defendant appeared very nervous when questioned about gun and that defendant spent day after murder plowing up ground between his house and the barn where victim was killed, and footprints leading from barn ended at the newly plowed spot). As a suspect to the crime and a friend of the victims, appellant's reaction to the news of their deaths is relevant and thus is admissible.

Appellant also objects to admission of opinion testimony by appellant's co-workers as to his feelings regarding the

break-up of his relationship with the victim. There is no error here inasmuch as Minn. R.Evid. 701 and our previous cases allow such evidence where it has an adequate basis and is helpful to the jury. *See State v. Zeimet*, 348 N.W.2d 338, 341–42 (Minn. 1984). The evidence here meets that standard.

Appellant's next challenge is his assertion that two questions asked by the prosecution of expert witnesses were improper attempts to shift the burden of proof. The prosecutor, in response to a suggestion by defense counsel that there would not be enough blood left for the defense to test after the state concluded its tests, asked the state's blood expert if there would be sufficient blood to test. The prosecutor also asked the defense's DNA expert, who was critical of the FBI's DNA testing procedures, whether he could do that type of procedure in his laboratory if samples were provided. We have said previously that the state may not comment on a defendant's failure to call witnesses. *State v. Caron*, 300 Minn. 123, 126–27, 218 N.W.2d 197, 199–200 (1974). We expressed concern that the jury, after hearing the comments, might believe that the defendant had a duty to call witnesses, or bore a burden of proof. *Id.* Here, the challenged questions were not nearly as explicit as the comments of the prosecutor in *Caron,* nor was there even the slightest suggestion that appellant was obligated to pursue independent testing. We find that the questions did not impermissibly shift the burden of proof.

Appellant also asserts there were two occasions during the trial where the jury was improperly informed that appellant was in jail. The first occasion was the admission of the photograph the police had shown to the cutlery store clerk to determine if she could identify appellant. Appellant asserts the admission of this photograph was unnecessary because the clerk had already identified him in the courtroom, and prejudicial because the jury may have inferred from the photograph that the appellant had been in jail. This court has previously observed that we do not approve

of the practice of admitting "mug shots" or "booking photographs," particularly if the defendant has already been identified. *See State v. Serna*, 290 N.W.2d 446, 448 (Minn. 1980). However, the photograph of appellant admitted in this case was not clearly a mug shot; it was a head and shoulders shot of appellant, in street clothes, looking straight at the camera. There was no indication of a jail background, of booking numbers, or of a jail uniform. Even if the jury did infer infer from the photograph that appellant was in jail at the time it was taken, they could infer that it was taken at the time he was arrested for these crimes, since the photograph was originally shown to the clerk the day after appellant's arrest.

Appellant challenges on a similar basis the testimony of the doctor who had treated appellant's hand injury on the night of the murders. During the course of his testimony, he volunteered that it was difficult to do the follow-up treatment of appellant because appellant was in jail. The prosecution did not solicit the comment or follow-up on it. The evidence did not suggest appellant was in jail for another crime, since the doctor was treating the hand injury he received the night the murders he was charged with occurred.

Furthermore, any possible harm which may have resulted from either of these pieces of evidence was limited by the trial court's jury instruction that the fact appellant was arrested could not be considered a suggestion of guilt. Furthermore, if error, the admission of the photograph and the doctor's statement was harmless. The admission of evidence with potential for unfair prejudice is harmless if the evidence of guilt is overwhelming and it is "extremely unlikely that the evidence prompted the jury to convict where it otherwise would not have." *State v. Hjerstrom*, 287 N.W.2d 625, 628 (Minn.1979). Given the overwhelming evidence of appellant's guilt, the photograph and the doctor's fleeting statement hardly seem likely to have influenced the jury to convict.

■ Appellant also challenges the admission of the DNA evidence on the grounds that the FBI's testing procedures in this case did not meet the reliability requirements of *State v. Schwartz*, 447 N.W.2d 422, 428 (Minn.1989). When determining the admissibility of evidence based on emerging scientific techniques, we evaluate the proffered evidence based on the test articulated in *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923). This court has restated that test to require that "experts in the field widely share the view that the results [of scientific testing] are scientifically reliable as accurate." *State v. Mack*, 292 N.W.2d 764, 768 (Minn.1980). This court has found that the principles underlying forensic DNA RFLP testing meet the *Frye* and *Mack* tests. *Schwartz*, 447 N.W.2d at 428. Whether the results of any specific DNA RFLP testing is admissible, however, depends on "the laboratory's compliance with appropriate standards and controls, and the availability of their testing data and results." *Id.* A pre-trial hearing is held to determine whether the specific DNA results offered for admission as evidence were developed in compliance with appropriate standards and controls.

The forensic DNA testing in this case was done by the FBI at its DNA testing laboratory in Washington, D.C. Appellant challenges the FBI's compliance with appropriate standards and controls, asserting that there had been no independent audit of the FBI laboratory and that creation of the FBI's underlying Caucasian database (necessary to eliminate the remote possibility of a "match" between samples not coming from the same individual) was flawed. Appellant also challenges the application of the DNA RFLP testing procedures in this case, asserting that the FBI did not have a mechanism to detect "band shifting," that it did not use an objective standard for determining a "match" and that two evaluators reached different conclusions as to the presence of a "match."

The standards and controls which establish the reliability of the FBI's DNA RFLP testing procedures emerge from both the FBI's internal laboratory protocols and the guidelines developed by the Technical Working Group on DNA Analysis Methods ("TWGDAM"). These guidelines, entitled Guidelines for a Quality Assurance Program for DNA Restriction Fragment Length Polymorphism Analysis, (hereinafter "guidelines") were developed by a group of thirty-one experts in the field of DNA testing. This court has recognized these guidelines as appropriate for guiding DNA testing. *See Schwartz*, 447 N.W.2d at 427–28. Dr. Dwight Adams, an employee of the FBI and a member of TWGDAM, testified that the FBI laboratory complied with the TWGDAM guidelines. Another independent expert, Dr. C. Thomas Caskey, agreed.

■ Specifically on the requirement of an independent laboratory audit, Section 10.1 of the Guidelines reads:

> Audits or inspections should be conducted annually by individuals separate from and independent of the DNA testing laboratory. It is highly desirable that at least one auditor be from an outside agency.

Guidelines for a Quality Assurance Program for DNA Restriction Fragment Length Polymorphism Analysis, § 10.1, 16 Crime Laboratory Digest 40, 54 (1989). Dr. Adams testified that at the time of the appellant's *Frye* hearing, there had been no independent audit of the FBI laboratory where the testing was done, because there was no one outside the FBI qualified to audit the facility. However, the FBI attempted compliance with section 10.1 of the guidelines by having the staff of its other DNA laboratory audit the laboratory in Washington, D.C. Dr. James Kearney, the chairman of TWGDAM, also testified that the guidelines were designed to be guidelines, not an inflexible set of rules.

At the conclusion of the appellant's *Frye* hearing, the trial court found that "the laboratory protocol adopted by the FBI DNA Analysis Unit at its forensic laboratory in Washington D.C. [was] an appropriate set of standards and guidelines for the implementation of forensic DNA RFLP analysis." We find nothing in the record which contradicts this conclusion. While it

is clear that a completely independent audit would be the ideal, there is no indication that the test procedures used compromised the DNA testing results in this case. Additionally, the record indicates that appellant's claim that the FBI was unable to repeat experiments under the same conditions when compiling its Caucasian DNA database is unfounded.

The remainder of appellant's challenges to the admission of the DNA evidence were to the application of the DNA RFLP testing procedures themselves, not challenges to the FBI's compliance with appropriate standards and controls. Appellant first claims that there was no test to eliminate the possibility of "band shifting," a potential problem with DNA RFLP testing which can yield a false "match." We note that appellant presented nothing to suggest the presence of this anomaly in the testing done in this case.[3] The second challenge, that the procedures to determine the presence of a match between a suspect's known DNA and the DNA from crime scene samples are not objective, is similarly unfounded. While a visual match by a trained examiner is the first stage of the "match" determination, each sample is also examined by a second trained examiner and ultimately the "match" is confirmed or rejected through computer analysis, using wholly objective criteria. This procedure conforms fully to the procedures recommended in the TWGDAM guidelines and in the more recent report issued by the National Research Council. Finally, the appellant argues that the two FBI examiners reached different conclusions when looking at the same samples. However, a review of the record indicates that any disagreement was, at worst, only as to the extent of the "match." The jury had the testimony of both experts before it, and thus could evaluate any differences in their testimony. We find no error on any of these claims.

▬▬▬▬ We recognize the problems faced by courts, defense attorneys, and prosecutors as each struggles with mastering this very technical area. As these issues are addressed in the future we want to emphasize that we decided the basic issue of the admissibility of DNA evidence derived from the DNA RFLP testing procedures in *Schwartz*. While we believe, given the evolving nature of this forensic specialty, a *Frye* hearing is still required, that hearing should focus only on whether the laboratory which did the testing was in compliance with the appropriate standards and controls.[4] It should not be a forum for challenging the basic DNA RFLP testing procedures themselves. Challenges to the underlying scientific principles go to the weight to be accorded the evidence and are properly introduced at trial.

In this case, the record fully and amply supports the trial court's conclusion that the FBI's DNA RFLP testing procedures met the standards of admissibility set forth by this court. Therefore, the trial court did not err by admitting the test results.

▬▬▬▬ Appellant asserts that the two consecutive life sentences imposed for his conviction of two counts of murder in the first degree was a departure from the Minnesota Sentencing Guidelines. The mandatory

---

**3.** The court takes judicial notice of a report issued between the time this case was tried and the issuance of this opinion. "DNA Technology in Forensic Science," prepared by the Committee on DNA Technology in Forensic Science of the National Research Council, was published in April, 1992, and deals with many of the issues previously addressed by the TWGDAM guidelines. In particular, we note the recommendation made in the report that in the future all DNA RFLP analyses be monitored for band shifting through the use of monomorphic probes. The record is not clear as to whether such monitoring was done for the samples at issue in this case. However, while we urge law enforcement agencies, prosecutors and courts to give consideration to this recommendation in the future, we decline to rule the evidence presented here inadmissible on this basis.

**4.** As noted throughout this opinion, in determining the admissibility of DNA evidence, this court has relied in the past upon an evaluation of laboratory compliance with the TWGDAM guidelines. The recently issued National Research Council report identified earlier endorses that approach, along with consideration of its own supplemental recommendations. We have reviewed that entire report and find nothing in it inconsistent with our determination in this case that the FBI's procedures were in compliance with appropriate standards.

sentence for murder in the first degree is life in prison. Minn.Stat. § 609.185. When sentencing a person convicted of multiple counts of murder in the first degree, the trial court has discretion to impose concurrent or consecutive life sentences. *See* Minn.Stat. § 609.15, subd. 1 (1990); Minnesota Sentencing Guidelines II.F.; *State v. Brom*, 463 N.W.2d 758, 765 (Minn.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1398, 113 L.Ed.2d 453 (1991); and *Bangert v. State*, 282 N.W.2d 540, 547 (Minn.1979).

■ Finally, appellant asserts that he was entitled to a sentencing hearing before his sentence was imposed. Appellant moved for a sentencing hearing and that motion was denied. A sentencing hearing, if requested, is required when a person has been convicted of a felony. Minn.Stat. § 244.10, subd. 1 (1990). The proper procedure for a violation of Minn.Stat. § 244.10 is a remand for a sentencing hearing under the procedures outlined in Minn.R.Crim.P. 27.03. *State v. Kelley*, 342 N.W.2d 148, 150 (Minn.1984). We therefore remand the case for a sentencing hearing and resentencing.[5]

Conviction affirmed, remanded for resentencing.

WAHL, J., took no part in the consideration or decision of this case.

---

**5.** Nothing in this opinion shall be taken to mean that the trial court may not resentence appellant to two consecutive life sentences, if it deems appropriate, following the sentencing hearing.